

# THE SUPREME COURT OF TEXAS
**Post Office Box 12248**
**Austin, Texas 78711**

**(512) 463-1312**

FILED IN COURT OF APPEALS
12th Court of Appeals District

SEP - 4 2007

TYLER, TEXAS
CATHY S. LUSK, CLERK

August 31, 2007

Ms. Diana L. Faust
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202

Mr. David G. Cabrales
Locke Liddell & Sapp LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776

Mr. Mark A. Stinnett
Stinnett Thiebaud & Remington L.L.P.
1445 Ross Avenue, Ste. 2500
Dallas, TX 75202

RE:    Case Number: 05-0823
       Court of Appeals Number: 12-04-00259-CV
       Trial Court Number: 2003-42-CCL2

Style:  PHC-MINDEN, L.P. D/B/A MINDEN MEDICAL CENTER
       v.
       KIMBERLY-CLARK CORPORATION

Dear Counsel:

Today the Supreme Court of Texas delivered the enclosed opinion and judgment in the above-referenced cause.

Sincerely,

Blake A. Hawthorne, Clerk
by Claudia Jenks, Chief Deputy Clerk

Enclosures
cc:  Mr. James K. Horstman
     Ms. Susan Cassidy Cooley
     Mr. Stephen A. Madsen
     Mr. Kenneth Charles Cunningham
     Ms. Cathy S. Lusk
     Ms. Barbara Duncan
     Mr. Roger Townsend
     Mr. C. W. "Rocky" Rhodes



FILED IN COURT OF APPEALS
12th Court of Appeals District

SEP – 4 2007

TYLER, TEXAS
CATHY S. LUSK, CLERK

12-04-00259-cv

# IN THE SUPREME COURT OF TEXAS

No. 05-0823

PHC-MINDEN, L.P. D/B/A MINDEN MEDICAL CENTER,
PETITIONER,

v.

KIMBERLY-CLARK CORPORATION,
RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS

**Argued November 16, 2006**

CHIEF JUSTICE JEFFERSON delivered the opinion of the Court.

The United States Constitution prohibits a court from exercising jurisdiction over a party that lacks minimum contacts with the forum. Personal jurisdiction has been described as either specific—that is, based on contacts arising from the dispute at issue—or general, predicated on a party's "continuous and systematic" contacts with the forum. Minimum-contacts analysis is easily muddled, however, as courts frequently import contacts relevant to one type of jurisdiction when deciding the other. Additionally, courts sometimes impute contacts of related entities to each other, when mere relatedness is an insufficient basis on which to confer jurisdiction. Today, we must

determine whether a Louisiana hospital, either independently or through its parent corporation, has continuous and systematic contacts with Texas. We conclude that it does not.

## I
## Factual and Procedural Background

While traveling through Louisiana on December 10, 2000, Texas resident Jajah Eddington sought medical care at MHC-Minden Hospital ("Minden Hospital"), a 159-bed acute care hospital located in Minden, Louisiana. Medical personnel treated Eddington's flu-like symptoms in the emergency room and advised her to consult her primary care physician if her condition did not improve. Four days later, Eddington was admitted to Good Shepherd Medical Center in Longview, Texas, where she ultimately was diagnosed with toxic shock syndrome. That infection led to her death on December 28, 2000.

DeWayne Eddington, individually and as next friend of Devvyn Eddington, and as representative of Jajah Eddington's estate, sued Kimberly-Clark Corporation asserting product liability, breach of warranty, and negligence claims. He alleged that Eddington's use of Kotex tampons led to the infection that caused her death. On February 28, 2003, Kimberly-Clark filed a third-party petition against PHC-Minden, L.P. ("Minden"), which owns Minden Hospital, asserting that Minden's negligence proximately caused Eddington's death.[1] Minden is a nonresident of Texas and a wholly owned subsidiary of Province Health Care ("Province"). Kimberly-Clark pleaded that Province, whose headquarters is in Tennessee, did business in Texas and that its forum-related acts

---

[1] Kimberly-Clark also filed third-party claims against Good Shepherd Medical Center; Longview Emergency Medicine Associates; Schumacher Group of Louisiana; Dr. Russell Riggs; Dr. Rodney Slone; Dr. Don Ferguson; D. Lea, R.N.; C. Bennett, R.N.; and C. Coleman, R.N.

2

should be imputed to Minden because: (1) Province owns Minden; (2) Province and Minden share officers, directors, and "common departments or business"; (3) Province and Minden do not differentiate their operations and have failed to erect "formal barriers" between themselves; and (4) Province's officers and directors control Minden's policies. Minden filed a special appearance and, subject thereto, a general denial. The parties conducted extensive discovery relating to the jurisdictional issue. After a hearing, the trial court concluded it had general jurisdiction over Minden and denied the special appearance.

The court of appeals affirmed, reasoning that (1) Minden itself had "continuous and systematic contacts with Texas"; and (2) Minden and Province operated as a single business enterprise, and Minden, through Province, did business in Texas. 202 S.W.3d 193, 203-04. We granted Minden's petition for review to decide whether Texas courts have general jurisdiction over Minden.[2] 49 Tex. Sup. Ct. J. 950 (Aug. 25, 2006).

## II
### General Jurisdiction

The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See* TEX. CIV. PRAC. & REM. CODE §§ 17.041-.045. That statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas, and the statute identifies some activities that constitute "doing business." *Id.* § 17.042. The list, however, is not exclusive. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). We have held that section 17.042's language extends Texas courts' personal jurisdiction "as far as the federal

---

[2] Charles W. "Rocky" Rhodes and Riata Energy, Inc. submitted amicus curiae briefs.

3

constitutional requirements of due process will permit." *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977). Thus, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own decisions, in determining whether a nonresident defendant has negated all bases of jurisdiction. *See BMC Software*, 83 S.W.3d at 795-796. Personal jurisdiction over nonresident defendants is constitutional when: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, the Supreme Court adopted the terms "specific" and "general" to describe the differing types of personal jurisdiction. *Helicopteros*, 466 U.S. 408, 414 (1984) (citing Arthur T. von Mehren & Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 HARV. L. REV. 1121, 1144-1164 (1966)). The Court defined specific jurisdiction as "arising out of or related to the defendant's contacts with the forum." *Id.* at n.8. By contrast, the Court referred to general jurisdiction as "personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum."[3] *Id.* at n.9 (citations omitted).

In *Helicopteros*, the Court concluded that Texas courts did not have general jurisdiction over a Colombian company, Helicol. One of Helicol's helicopters had been involved in a crash in Peru,

---

[3] The use of the terms "specific" and "general" to connote differing types of personal jurisdiction has been criticized as contributing to the confusion among courts as to the quality and quantity of contacts required for each. *See* Mary Twitchell, *The Myth of General Jurisdiction*, 101 HARV. L. REV. 610, 612-13 (1988) (suggesting that the "general/specific framework" has led to ambiguity and suggesting the terms "dispute-blind" and "dispute-specific" instead). Ironically, Professors von Mehren and Trautman suggested the terms "specific" and "general" to alleviate the confusion associated with the "in rem," "quasi in rem," and "in personam" jurisdictional terminology. von Mehren & Trautman, *Jurisdiction to Adjudicate*, 79 HARV. L. REV. at 1135-36 (noting that "some of the terminology conventionally employed in Anglo-American discussions of jurisdiction to adjudicate is not very helpful").

4

and the survivors and representatives of the decedents sued Helicol in state district court in Harris County, Texas. Helicol filed a special appearance and moved to dismiss the case, but the trial court denied the motion. The court of appeals, however, agreed with Helicol that in personam jurisdiction over Helicol was lacking. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 616 S.W.2d 247 (Tex. App.—Houston 1981). Our Court reversed. *Hall v. Helicopteros Nacionales de Colombia, S.A.*, 638 S.W.2d 870 (1982).

The Supreme Court granted certiorari, and it summarized the pertinent jurisdictional facts:

> It is undisputed that Helicol does not have a place of business in Texas and never has been licensed to do business in the State. Basically, Helicol's contacts with Texas consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training.

*Helicopteros*, 466 U.S. at 416. The Court concluded that the CEO's trip to Houston could not be described as a "continuous or systematic" contact. *Id.* Similarly, it held that Helicol's acceptance of checks drawn on a Houston bank was of "negligible significance." *Id.* at 416. The Court held, relying on a 1923 unanimous opinion written by Justice Brandeis, that "purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction." *Id.* at 417 (citing *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516 (1923)).

The point at which jurisdictional contacts reach a tipping point, however, has eluded precise formulation. Beyond stating that mere purchases and related travel are not enough, the Supreme Court has given little guidance on the appropriate inquiry for general jurisdiction, although its *Helicopteros* conclusion that general jurisdiction was improper suggests that the requisite level of

contacts is fairly substantial. 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 108.41[3] (3d ed. 2007); 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (2007) (noting that the Court's rejection of each contact and its failure to aggregate contacts "suggests very strongly that the threshold contacts required for a constitutional assertion of general jurisdiction over a nonresident defendant are very substantial, indeed"). *Perkins v. Benguet Consolidated Mining Co.*, the only case in which that court has upheld a finding of general jurisdiction, offers an insight into the nature of the contacts required. *Perkins*, 342 U.S. 437 (1952). In assessing whether the nonresident defendant's Ohio contacts were sufficient to warrant a finding of general jurisdiction, the Court noted that the company's president, who was also the general manager and principal shareholder, maintained an Ohio office in which he "did many things on behalf of the company." *Id*. at 447-48. He maintained company files in Ohio, carried on correspondence from there, drew and distributed salary checks from his Ohio office, used two Ohio bank accounts for company funds and had an Ohio bank act as transfer agent for the company's stock, held directors' meetings in Ohio, supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines there, and dispatched funds from Ohio bank accounts to cover purchases of machinery for such rehabilitation. *Id*. The Court concluded that the company "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company," and even though "no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons." *Id*. at 448.

6

The Court held that "under the circumstances above recited, it would not violate federal due process for Ohio either to take or decline jurisdiction of the corporation in this proceeding." *Id.*

A general jurisdiction inquiry, therefore, is very different from a specific jurisdiction inquiry and involves a "more demanding minimum contacts analysis," *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996), with a "substantially higher" threshold, 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5. Usually, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5; *see also Hall*, 638 S.W.2d at 882 (Pope, J., dissenting) (noting that "substantial and continuous activity" required for general jurisdiction suggests that defendant "must establish some close substantial connection with the state approaching the relationship between the state and its own residents"); 16 MOORE'S FEDERAL PRACTICE § 108.41[3] (stating that general jurisdiction "typically requires the defendant to have an office in the forum state"); Lea Brilmayer, *A General Look at General Jurisdiction*, 66 TEX. L. REV. 723, 742 (1988) (proposing that "the basic inquiry must be whether the defendant's level of activity rises to the level of activity of an insider, so that relegating the defendant to the political processes is fair"); Charles W. "Rocky" Rhodes, *Clarifying General Jurisdiction*, 34 SETON HALL L. REV. 807, 811 (2004) (suggesting that a proper general jurisdiction query should evaluate whether the defendant engaged in activities in the forum state similar in frequency and nature to the activities of local businesses); Mary Twitchell, *The Myth of General Jurisdiction*, 101 HARV. L. REV. 610, 635 (1988) (noting that "traditional indicia" of general jurisdiction are "a home base, an agent

7

for the service of process, a local office, or the pursuance of business from a tangible locale within the state").

General jurisdiction has been described as "dispute-blind," an exercise of the court's jurisdiction made without regard to the nature of the claim presented. Twitchell, *The Myth of General Jurisdiction*, 101 HARV. L. REV. at 613. It involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state. 16 MOORE'S FEDERAL PRACTICE § 108.40. Some commentators suggest that courts assessing general jurisdiction employ an analytical device to determine whether the jurisdiction is, in fact, dispute-blind. Twitchell, *The Myth of General Jurisdiction*, at 680; Rhodes, *Clarifying General Jurisdiction*, 34 SETON HALL L. REV. at 819. They propose that the court construct a hypothetical claim without any forum connection "to insure that any related forum activities of the defendant are not improperly infiltrating the dispute-blind query." *Clarifying General Jurisdiction*, 34 SETON HALL L. REV. at 819. For example:

> [A]re the corporate defendant's actual activities in California so pervasive and extensive that it should be amenable to the adjudicatory jurisdiction of California for a hypothetical employment discrimination claim filed by a New York citizen employed at corporate headquarters in New York? Or, with respect to a foreign corporation, do the corporation's actual California contacts support jurisdiction even for a hypothetical cause of action arising from its sale of a product in Germany that injured a German citizen?

*Id.* at 819-20. Such an inquiry properly frames the issue, as general jurisdiction is based solely on the defendant's "continuous and systematic" contacts with the forum. *Helicopteros*, 466 U.S. at 416.

# A
## Minden's Contacts

With this in mind, we turn to an analysis of Minden's Texas contacts, as the court of appeals concluded that Minden had "continuous and systematic contacts with Texas" sufficient to support general jurisdiction. 202 S.W.3d at 204. We first determine the appropriate time period for assessing contacts for purposes of general jurisdiction, an issue on which our courts of appeals are in conflict. Some examine the defendant's forum-related activities up to the time of the occurrence that prompted the suit. *See MedCost, L.L.C. v. Loiseau*, 166 S.W.3d 421, 434 (Tex. App.—Austin 2005, no pet.); *Schott Glas v. Adame*, 178 S.W.3d 307, 313-14 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *AmQuip Corp. v. Cloud*, 73 S.W.3d 380, 388 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Others focus on contacts up to the time of filing suit. *See, e.g., Equitable Prod. Co. v. Canales-Trevino*, 136 S.W.3d 235, 237-38, 245 (Tex. App.—San Antonio 2004, pet. denied) (considering corporate defendant's relocation from Texas, which occurred after the cause of action accrued but before suit was filed, for purposes of determining jurisdiction); *see also Tuscano v. Osterberg*, 82 S.W.3d 457, 467 (Tex. App.—El Paso 2002, no pet.) (holding that jurisdictional contacts were "too attenuated in time," because such activities occurred more than "three years before service of this suit was effected"). Another—the court of appeals in this case—noted the conflict and assessed contacts under both timetables.[4] 202 S.W.3d at 203 ("A relevant continuous contact in this analysis includes those contacts over a period up to the date of injury . . . or up to and including the date suit commenced . . . .").

---

[4] This conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c).

9

We conclude that the relevant period ends at the time suit is filed. As noted above, general jurisdiction is dispute-blind; accordingly, and in contrast to specific jurisdiction, the incident made the basis of the suit should not be the focus in assessing continuous and systematic contacts—contacts on which jurisdiction over any claim may be based. *See* Charles W. "Rocky" Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study of the Effects of a "Generally" Too Broad, But "Specifically" Too Narrow Approach to Minimum Contacts*, 57 BAYLOR L. REV. 135, 238 (2005) (noting that "analyzing the contacts at the time of accrual is not appropriate under the proper explanation of general jurisdiction as dispute-blind general adjudicative authority"); *see also* 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (noting that "a court should consider all of a defendant's contacts with the forum state prior to the filing of the lawsuit"). We also agree that "a mere one-time snapshot of the defendant's in-state activities" may not be sufficient, *see* Rhodes, *Predictability Principle*, 57 BAYLOR L. REV. at 239, and contacts should be assessed over a reasonable number of years, up to the date suit is filed, *see Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999). This includes contacts at the time the cause of action arose, and it comports with the Supreme Court's guidance on the issue, as well as our prior caselaw. *See Helicopteros*, 466 U.S. at 409-11 (evaluating contacts over the seven-year period before suit was filed); *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807-08 (Tex. 2002) (assessing contacts over the twenty-year period preceding suit).

We now turn to Minden's contacts up to the time of suit. A general jurisdiction inquiry can be tedious, as it "demands . . . that all contacts be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity." *Schlobohm v. Schapiro*, 784

10

S.W.2d 355, 359 (Tex. 1990). In conducting this dispute-blind inquiry, Jajah's Eddington's status as a Texas resident, her treatment in Minden Hospital's emergency room, and her family's choice not to sue Minden are irrelevant. Instead, we focus solely on Minden's contacts with Texas. Minden is a nonresident limited partnership that owns a hospital licensed by the state of Louisiana. Minden's only facility is in Minden, Louisiana, and ninety percent of its patients reside within a twenty-five mile radius of Minden Hospital. Minden does not advertise in Texas. It owns no Texas property and has no Texas office or bank accounts, nor does it maintain a registered agent for service of process here. The court of appeals relied on three categories of contacts in determining that Minden's Texas contacts were continuous and systematic: (1) Minden employees' attendance at seminars in Texas; (2) Minden's purchases from vendors with Texas addresses; and (3) three contracts with Texas entities. We examine each in turn.

### 1. Texas Trips

The evidence showed that, since 1999, Minden employees attended two Province-sponsored meetings in Dallas. These isolated trips fall short of the "continuous and systematic contact" the Supreme Court requires. In *Helicopteros*, the Supreme Court rejected the notion that multiple trips to Fort Worth supported general jurisdiction, noting that the trips did not "in any way enhance[] the company's contacts with Texas." 466 U.S. at 418; *see also Kulko v. California Superior Court*, 436 U.S. 84, 93 (1978) (basing California jurisdiction on 3-day and 1-day stopovers in that State "would make a mockery of" due process limitations on assertion of personal jurisdiction); *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex. 1995) (concluding that attending a meeting in Texas,

11

as well as periodic mailings to Texas members, "presented no evidence of general jurisdiction"). We agree with that analysis.

## 2. Payments to Texas Vendors

Since October 1, 1999, Minden paid $1,508,467.20 to 136 entities with Texas addresses. The largest payment, $515,650.15, was to Alcon Laboratories in Dallas, Texas, and the second largest, $209,997.36, to Centerpoint Energy in Houston, Texas. Most of the remaining payments are for less than $10,000.00 each. In *Helicopteros*, 466 U.S. at 418, the Supreme Court held that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." And we have recognized that "purchases from Texas vendors will not alone support the exercise of general jurisdiction." *American Type Culture Collection,* 83 S.W.3d at 808. We conclude that the payments to Texas vendors do not support general jurisdiction over Minden in Texas.

## 3. Contracts with Texas Entities

The court of appeals also identified three contracts with a Texas connection: (1) a September 23, 2003 contract with Cox Business Services, a Tyler, Texas-based company, for internet service (at a charge of $59.95 per month) and a cable modem; (2) a July 2002 contract with Lone Star Research, located in The Woodlands, Texas, pursuant to which Lone Star Research would conduct a one-time marketing survey of 200 adult residents in Minden Hospital's service area; and (3) an April 2001 professional services agreement with Horizon Radiology, P.A., a Texas company,

12

whereby Horizon would provide specialty coverage (via teleradiology equipment) to Minden Hospital, in exchange for $1600 per month.

We agree with the court of appeals that the 2003 Cox contract, entered into after suit was filed, is irrelevant to the jurisdictional inquiry here. 202 S.W.3d at 203. The 2002 Lone Star contract pursuant to which a Texas company conducted a marketing study of residents in Minden Hospital's service area—presumably Louisiana, as ninety percent of the hospital's patients live within twenty-five miles of the hospital—does not establish a continuous and systematic Texas contact. Lone Star agreed to conduct 200 telephone interviews and analyze the data within a week of the survey's completion, in exchange for $5,200. This type of sporadic Texas contact is not substantial enough for general jurisdiction.

Of the three contracts, the Horizon agreement has the most substantial connection to Texas. The agreement, signed in 2001 and renewed twice thereafter, required that Louisiana-licensed physicians (located in Texas) provide teleradiology services, for which Minden supplied the necessary equipment, in exchange for $1600 per month. Even this agreement, however, does not support general jurisdiction. Hiring a contractor to perform such limited services in the forum state does not equate to "continuous and systematic contacts."

Even when amassed, Minden's Texas contacts simply are not "continuous and systematic general business contacts" sufficient to support general jurisdiction, particularly when compared to the substantial, regular business activities conducted by the nonresident defendant in *Perkins*. *Helicopteros*, 466 U.S. at 416; *Perkins*, 342 U.S. at 447-48. Instead, the facts here are more like

13

those described in *Helicopteros*: the nonresident defendant had limited contacts with Texas but none sufficient to support general jurisdiction. Accordingly, the court of appeals erred in holding otherwise.

## B
## Jurisdictional Veil-Piercing

As its second basis for general jurisdiction, the court of appeals imputed Province's Texas contacts to Minden, concluding the two entities operated as a single business enterprise and that Minden, through Province, did business in Texas. In 1925, the Supreme Court of the United States considered whether a North Carolina court had jurisdiction over a nonresident parent corporation whose subsidiary did business in North Carolina. *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335 (1925). In affirming the district court's dismissal for lack of jurisdiction, the Court held:

> Through ownership of the entire capital stock and otherwise, the defendant dominates [its subsidiary], immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the [defendant's] products in other states. The existence of the [subsidiary] as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations.

*Id.* The Court concluded that "the corporate separation, though perhaps merely formal, was real. It was not pure fiction." *Id.* at 337.

14

The Court has never disavowed *Cannon*, despite an opportunity to do so. Instead, it essentially echoed the *Cannon* rule in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984). *See* William A. Voxman, Comment, *Jurisdiction over a Parent Corporation in Its Subsidiary's State of Incorporation*, 141 U. PA. L. REV. 327, 339 (1992) (noting that *Keeton* footnote implicitly recognized *Cannon*'s continuing validity). In that case, then-Justice Rehnquist, writing for the Court, noted that "jurisdiction over a parent corporation [does not] automatically establish jurisdiction over a wholly owned subsidiary. . . . Each defendant's contacts with the forum State must be assessed individually." *Keeton*, 465 U.S. at 781 n. 13; *see also* Voxman, 141 U. PA. L. REV. at 338 (noting that "[t]he clear implication of Rehnquist's assertion is that the nature of the parent-subsidiary relationship may well be a factor in determining whether jurisdiction comports with due process, but the existence of the relationship will not, in and of itself, be dispositive of the issue").

The Fifth Circuit Court of Appeals followed *Cannon* in *Hargrave v. Fibreboard Corp.*:

> *Cannon* . . . stands for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. Cases in this circuit appear to have followed the *Cannon* rule in applying the Texas long-arm statute, although sometimes without explicit citation. We have noted often that 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations. Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes. The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship. All the relevant facts and circumstances surrounding the operations of the parent and subsidiary must be examined to determine whether two separate and distinct corporate entities exist.

15

*Hargrave*, 710 F.2d 1154, 1160 (5th Cir. 1983)(citations omitted). The court held that the two corporations at issue "maintained a degree of corporate separation that was more than superficial" and "[t]he policy making authority held and exercised by [the parent] was no more than that appropriate for a sole shareholder of a corporation" and not enough to warrant the extraterritorial exercise of jurisdiction over that shareholder. *Id.* at 1161. The court concluded: "The Lone Star of Texas may shine brightly throughout the world, but its long arm is not judicially all encompassing." *Id.*

We recently followed *Hargrave* (and, by implication, *Cannon*) in explaining when the contacts of a related corporate entity may be considered for purposes of determining general jurisdiction. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795-796 (Tex. 2002). We held that "[p]ersonal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's 'doing business' to the subsidiary." *Id.* at 798 (citing *Hargrave*, 710 F.2d at 1159 and *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978)). The rationale for exercising jurisdiction is that "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Id.* (quoting *Hargrave*, 710 F.2d at 1159 (citations omitted)). We required that the party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities prove this allegation, because Texas law presumes that two separate corporations are distinct entities. *Id.*; *accord* 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4 (noting a "reluctance to exercise

16

personal jurisdiction over a subsidiary merely because its parent corporation is doing business in the forum state"). We concluded that there was no evidence to support the trial court's finding of general jurisdiction over a Belgian subsidiary based on allegations it was the alter ego of its American parent. *BMC Software*, 83 S.W.3d at 801.

### 1. Single Business Enterprise

Here, the court of appeals held that Province and Minden operated as a single business enterprise—a theory we have never endorsed—and, therefore, Province's Texas contacts could be imputed to Minden.[5] 202 S.W.3d at 202; *see Southern Union Co. v. City of Edinburg*, 129 S.W.3d 74, 86-87 (Tex. 2003) (noting that this Court "has never considered the 'single business enterprise' concept in any detail" and declining to decide "whether a theory of 'single business enterprise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure"). In doing so, the court of appeals examined eight factors as they related to Minden and Province: (1) common employees, (2) common offices, (3) centralized accounting, (4) payment of wages by one corporation to another corporation's employees, (5) common business name, (6) services rendered by the employees of one corporation on behalf of another corporation, (7) undocumented transfers of funds between corporations, and (8) unclear allocation of profits and losses between corporations. 202 S.W.3d at 201-02. The court's analysis failed to recognize,

---

[5] The record contains no evidence regarding the structure of Province's ownership of Texas hospitals. That is, there is no evidence regarding whether those hospitals are owned directly by Province or instead by a wholly owned subsidiary like Minden. The parties assume that Province (rather than its subsidiaries) does business in Texas; for purposes of our analysis, we make the same assumption.

however, that veil-piercing for purposes of liability ("substantive veil-piercing") is distinct from imputing one entity's contacts to another for jurisdictional purposes ("jurisdictional veil-piercing").

Courts have acknowledged that jurisdictional veil-piercing and substantive veil-piercing involve different elements of proof. *See, e.g., Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 425 (9th Cir. 1977) (noting that undercapitalization, "which is important to deciding whether to pierce the veil raised by a subsidiary corporation in order to hold the parent corporation liable for failure of the subsidiary to meet its debts, may not be relevant to a showing that the two corporations are in fact one so as to establish that the out-of-state corporation—be it parent or subsidiary—is present within the forum for jurisdictional purposes"; instead, "the operative question is whether the two corporations are in fact mere 'divisions' or 'branches' of a larger whole"); *Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 721 n.5 (Tex. App.—Austin 2000, pet. dism'd w.o.j.) ("Although many of the factors relevant to [determining whether subsidiaries' contacts should be imputed to parent] may also be relevant in determining whether a parent corporation should be liable for the actions of its subsidiary, the determination whether two corporate entities are one and the same for jurisdictional purposes is distinct."), *cert. denied*, 535 U.S. 1077 (2002); *see also* 2-32 WILLIAM V. DORSANEO, TEXAS LITIGATION GUIDE § 32.06 (2005). This makes sense in light of the fact that personal jurisdiction involves due process considerations that may not be overriden by statutes or the common law. *Cf. City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 667-668 (6th Cir. 2005) (refusing, in case involving jurisdictional allegations based on alleged "control person" under the securities laws, to "substitute our analysis of the securities laws' substantive bases for liability for the required, due-process based personal

18

jurisdiction analysis"); *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) (concluding that "liability is not to be conflated with amenability to suit in a particular forum. Personal jurisdiction has constitutional dimensions, and regardless of policy goals, Congress cannot override the due process clause, the source of protection for non-resident defendants."); *In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 129 (D.D.C. 2003) (noting that liability under the Securities Act "cannot on its own support personal jurisdiction," as such an approach "impermissibly conflates statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair"); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790-91 (Tex. 2005) (rejecting theory that where defendant "directed a tort" was relevant inquiry for specific jurisdiction, as such a rule improperly "equat[ed] the jurisdictional inquiry with the underlying merits"); *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (observing that "[c]onspiracy as an independent basis for jurisdiction has been criticized as distracting from the ultimate due process inquiry: whether the out-of-state defendant's contact with the forum was such that it should reasonably anticipate being haled into a court in the forum state" and declining to recognize personal jurisdiction based on conspiracy allegation); John A. Swain & Edwin E. Aguilar, *Piercing the Veil to Assert Personal Jurisdiction Over Corporate Affiliates*: *An Empirical Study of the Cannon Doctrine*, 84 B.U.L. REV. 445, 453 (2004) (noting that "the principle of limited liability is statutory and does not speak to judicial jurisdiction").

For this reason, fraud—which is vital to piercing the corporate veil under section 21.223 of the Business Organizations Code—has no place in assessing contacts to determine jurisdiction. *See* TEX. BUS. ORGS. CODE § 21.223. Similarly, some of the factors courts look to in determining

19

whether an entity may be held liable as a "single business enterprise" are irrelevant to an analysis of jurisdictional contacts. For example, the court of appeals examined whether Province and Minden shared a common name and concluded that "[Minden's] partnership name and initials, PHC-Minden, L.P. can be construed as a reference to Province Healthcare Company." 202 S.W.3d 201. Whether two related entities share a common name, however, does not affect whether each has sufficient contacts with the forum for jurisdictional purposes.

## 2. Factors

Instead, we recently outlined the relevant factors for jurisdictional veil-piercing:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*BMC Software*, 83 S.W.3d at 799 (citations omitted). We also relied on our prior precedent, which held that "[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975). A leading treatise suggests that in determining whether a subsidiary corporation is subject to the jurisdiction of a forum state because its parent corporation is present or doing business there, courts should determine whether the subsidiary is "separate and distinct from its parent corporation for personal jurisdiction purposes," taking into account the amount of the

subsidiary's stock owned by the parent corporation, the existence of separate headquarters, the observance of corporate formalities, and the degree of the parent's control over the general policy and administration of the subsidiary. 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4.

Here, the court of appeals cited the following as evidence that Province and Minden were a single business enterprise:

> the record shows that Province and [Minden] have at least one common employee and that Province pays certain [Minden] employees, although the salaries are intercompany payables. The names of the two companies are similar, and Province employees provide various services to assist [Minden] in its operations. Province exercises control over [Minden]'s revenues and expenditures and oversees [Minden]'s operations, financial performance, and completion of strategic initiatives. Further, Province audits [Minden]'s financial goals to determine if [Minden] will be able to meet these goals. Considering the totality of this evidence, we conclude that Province and [Minden] have integrated their resources to achieve a common business purpose.

202 S.W.3d at 202.

Upon closer examination, however, it is clear that Province does not exercise the sort of control over Minden that is required to fuse them for jurisdictional purposes. *BMC Software*, 83 S.W.3d at 799. Much of the evidence cited points to parental involvement—involvement consistent with its investor status—not atypical control. *See* 16 MOORE'S FEDERAL PRACTICE § 108.42[3][b]. "Appropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies." *Id.* What is lacking here is the "plus" factor, "something beyond the subsidiary's mere presence within

21

the bosom of the corporate family." *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999); *see also Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000) (holding that "constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary"); *De Castro v. Sanifill, Inc.*, 198 F.3d 282, 283-84 (1st Cir. 1999) (requiring "strong and robust" evidence of parental control over subsidiary, such that subsidiary is "mere shell," before subsidiary's contacts could be imputed to parent). The two entities maintain separate headquarters, Minden in Louisiana and Province in Tennessee. Minden's Board of Governors approves Minden's budget and oversees day-to-day operations, and Minden alone establishes its policies and procedures for providing health care to patients. Province is not involved in Minden's physician recruitment, and the two entities share no directors. While Minden's chief executive officer, chief nursing officer, and chief financial officer receive their paychecks from Province, their salaries are intercompany payables; that is, the monies come from Minden's revenues. Similarly, while Province provides Minden's general liability insurance and a group health insurance policy for its employees, the policies are funded from Minden's revenues. There is no indication that Minden and Province have disregarded corporate formalities. The court of appeals cited evidence that two Minden employees received Province stock options, but we have said that "a parent company's offering a stock option plan to a subsidiary's employees is acceptable under IRS regulations and is not evidence of abnormal control over the subsidiary." *BMC Software*, 83 S.W.3d

22

at 800. Put simply, we find no evidence of control other than that consistent with Province's investor status, and the court of appeals erred in imputing Province's Texas contacts to Minden.

## III

### Conclusion

Minden does not have continuous and systematic contacts with Texas, nor is there any basis for imputing Province's Texas contacts to Minden. We reverse the court of appeals' judgment and render judgment dismissing the claims against Minden for want of jurisdiction. TEX. R. APP. P. 60.2(c).

_____
Wallace B. Jefferson
Chief Justice

**OPINION DELIVERED:**   August 31, 2007

23

12-04-00259-CV

FILED IN COURT OF APPEALS
12th Court of Appeals District

SEP - 4 2007

TYLER, TEXAS
CATHY S. LUSK, CLERK

# IN THE SUPREME COURT OF TEXAS

No. 05-0823

PHC-MINDEN, L.P. D/B/A MINDEN MEDICAL CENTER,
PETITIONER,

v.

KIMBERLY-CLARK CORPORATION,
RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS

### Judgment

THE SUPREME COURT OF TEXAS, having heard this cause on petition for review from the Court of Appeals for the Twelfth District, and having considered the appellate record, counsels' briefs, and counsels' argument, concludes that the court of appeals' judgment should be reversed. IT IS THEREFORE ORDERED, in accordance with the Court's opinion, that:

1)  The court of appeals' judgment is reversed;

2)  Judgment is rendered dismissing the claims against PHC-Minden, L.P. d/b/a Minden Medical Center for want of jurisdiction; and

3)  PHC-Minden, L.P. d/b/a Minden Medical Center, shall recover, and Kimberly-Clark Corporation shall pay, the costs incurred in this Court and in the court of appeals.



Copies of this judgment and the Court's opinion are certified to the Court of Appeals for the Twelfth District and to the County Court of Gregg County, Texas, for observance.

Opinion of the Court delivered by Chief Justice Jefferson.

August 31, 2007

**********

2