

# NUMBER 13-21-00062-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**CAPITAL TITLE OF TEXAS, LLC,**         **Appellant,**

**v.**

**MARK SHANK AND DOUGLAS SHANK,**         **Appellees.**

**On appeal from the 398th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Justice Benavides**

In this interlocutory appeal from the granting of special appearances, appellant Capital Title of Texas, LLC (Capital Title) contends that the trial court has specific personal jurisdiction over appellees Mark and Douglas Shank. We reverse and remand.

## I.   BACKGROUND

Carolyn Shank and Robert Eugene Shank (Robert Sr.) married in 1977. Robert Sr. had four children from a previous marriage—David, Mark, Douglas, and Robert Jr. In 2010, Carolyn and Robert Sr., residents of Kansas, purchased a second home in City of Alamo, Texas. Robert Sr. died in 2018, and although he left a will devising his interest in the property to Carolyn, she elected not to probate the will.

In 2019, Carolyn entered a contract to sell the property to two Texas residents. Per the contract, Carolyn furnished the sellers with a title policy issued by Capital Title, which also served as the escrow agent. Carolyn executed an affidavit of heirship identifying David, Mark, Douglas, and Robert Jr. as Robert Sr.'s only children. All four children are residents of other states. In the affidavit, Carolyn also represented that "there has been no administration of [Robert Sr.'s] estate nor is any administration expected or necessary."

Under Texas intestacy laws, Robert Sr.'s undivided 50% interest in the property passed upon his death to his four children in equal shares of 12.5%. *See* TEX. EST. CODE ANN. § 201.003(c); *see also id.* § 256.001 (providing generally that "a will is not effective to prove title to, or the right to possession of, any property disposed of by the will until the will is admitted to probate"). Accordingly, Capital Title contacted the four brothers, informing them about the impending sale, their respective interests in the proceeds, and the need for them to execute the general warranty deed to effectuate the sale. Each brother executed the general warranty deed and returned it to Capital Title for recording.

The four brothers were also provided copies of the affidavit of heirship and Robert

2

Sr.'s unprobated will. David and Robert Jr. instructed Capital Title to distribute their shares to Carolyn, meaning Carolyn would receive 75% of the sale proceeds and Douglas and Mark would each receive 12.5%. For reasons that are in dispute, Capital Title instead distributed 50% of the sale proceeds to Carolyn, while Douglas and Mark each received 25%.

Capital Title subsequently informed Douglas and Mark that they had received their brothers' shares in error and requested that they either return the shares to Capital Title or pay them directly to their brothers. After Douglas and Mark denied that request, Carolyn, David, and Robert Jr. sued Capital Title, alleging the company breached its fiduciary duty to them as the escrow agent and violated various provisions of the Texas Deceptive Trade Practices-Consumer Protection Act.[1]

Capital Title filed a general denial and a third-party petition against Douglas and Mark for unjust enrichment, alleging that the trial court had specific personal jurisdiction over the brothers. Specifically, Capital Title alleged that the brothers "engaged in conduct in and/or directed toward Hidalgo County, Texas, having direct contact with business conducted in Hidalgo County and with persons doing business in Hidalgo County in connection with the real estate transaction at issue, and including receipt . . . of proceeds from the transaction."

Mark, a resident of Kansas, and Douglas, a resident of Louisiana, filed a combined special appearance. In support of their special appearance, each brother filed an affidavit. In his affidavit, Mark stated:

---

[1] Carolyn died during the pendency of the suit, and the executrix of her estate was substituted in her place.

My father passed away in April of 2018. In May of 2019, I received email correspondence from [Capital Title] along with a Warranty Deed and Federal Express air bill requesting my signature and return of the Warranty Deed, and informing me that the property owned by my father in Alamo, Texas was being sold and I would be receiving a certain amount of money from the proceeds of the sale. I simply signed the Warranty Deed and returned it as requested. I did not have anything to do with the sale of the property nor did I initiate any contact regarding this transaction.

Douglas made identical allegations in his affidavit but also acknowledged that he "called Capital Title once or twice inquiring what this matter was about."

Capital Title responded that the brothers' involvement in the transaction was more than incidental because they: (1) participated in email and phone correspondence with Capital Title regarding the sale of the property and the distribution of the proceeds; (2) executed a general warranty deed and a document titled "Seller Proceeds Instructions" and returned these documents to Capital Title in Texas; (3) received proceeds from the sale drawn on a Texas bank account; and (4) incurred taxes in Texas from the sale of the property. Capital Title filed an affidavit from a corporate representative that states, in part:

5. In 2019, Carolyn Shank entered into a contract to sell the [p]roperty and sought a title insurance policy from Capital Title as part of the sale[.] Capital Title also served as the escrow agent. At this time Carolyn Shank signed an Affidavit of Heirship swearing that there was no administration of the estate and none was necessary.

6. Because there had not been an administration, Capital Title discussed with each of the four children, Robert [Jr.], David (through Robert [Jr.]), Mark and Douglas Shank[,] about distribution of the proceeds from the sale of the [p]roperty.

7. Capital Title was instructed by Robert Shank [Jr.] that he and David Shank did not want payment from the sale of the [p]roperty and that their proceeds should go to Carolyn Shank. In turn, Carolyn Shank signed a distribution statement causing that portion of the proceeds to be disbursed evenly to Mark and Douglas Shank.

4

8.   Moreover, Mark and Douglas Shank entered into Proceeds Distribution Agreements with Capital Title instructing Capital Title in Texas, how to disburse their proceeds from the sale of the [p]roperty. However, Robert Shank [Jr.] and David Shank never entered into any such agreements.

9.   Capital Title is no longer holding any proceeds from this sales transaction. Those funds were released pursuant to the distribution statement signed by Carolyn Shank at the time of closing, and the Proceeds Distribution Agreements provided to Capital Title at the time of closing from Mark and Douglas Shank. Capital Title acted in reliance upon and complied with the instructions it received under the Proceeds Distribution Agreements it was provided by Mark and Douglas Shank.

Capital Title also provided various supporting documents, including copies of the sales contract between Carolyn and the buyers, the affidavit of heirship executed by Carolyn, Robert Sr.'s unprobated will, the general warranty deed, the settlement statement executed by Carolyn, the "Seller Proceeds Instructions" completed and signed by Douglas and Mark, 1099-S forms[2] signed by Douglas and Mark, bank statements showing the distributions from Capital Title to Douglas and Mark, and email correspondence between Capital Title and Robert Jr., Douglas, and Mark.

After holding a hearing, the trial court granted the special appearances, issuing no findings of fact or conclusions of law. This interlocutory appeal ensued. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7).

## II.   STANDARD OF REVIEW & APPLICABLE LAW

### A.   Standard of Review

"A court must have both subject matter jurisdiction over a case and personal

---

[2] A 1099-S form is used "to report the sale or exchange of real estate" to the Internal Revenue Service. *About Form 1099-S, Proceeds from Real Estate Transactions*, INTERNAL REVENUE SERV., https://www.irs.gov/forms-pubs/about-form-1099-s (Mar. 12, 2021).

jurisdiction over the parties to issue a binding judgment." *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7–8 (Tex. 2021); *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010). Personal jurisdiction involves a court's ability to bind a particular party to that judgment. *Luciano*, 625 S.W.3d at 8; *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). A special appearance allows a nonresident to appear in a Texas court for the limited purpose of challenging the court's exercise of personal jurisdiction. *See* Tex. R. Civ. P. 120a(1).

Whether a trial court may exercise personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002)). In resolving this legal question, the trial court may be required to decide questions of fact. *Luciano*, 625 S.W.3d at 8; *Am. Type Culture Collection*, 83 S.W.3d at 806. "When, as here, the trial court does not issue findings of fact and conclusions of law with its judgment, we presume all factual disputes were resolved in favor of the trial court's decision unless they are challenged on appeal." *Luciano*, 625 S.W.3d at 8; *see Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

## B.    Personal Jurisdiction

Under Texas's long-arm statute, Texas courts may exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *PHC-Minden, L.P., v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007). A nonresident "does business" in Texas if, among other things, it contracts

6

with a Texas resident and either party performs the contract in whole or in part in Texas or the nonresident commits a tort in whole or in part in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1), (2).

However, because the exercise of personal jurisdiction over a nonresident implicates due process concerns, the Texas long-arm statute reaches only "as far as the federal constitutional requirements of due process will permit." *PHC-Minden*, 235 S.W.3d at 166 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)); *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011) ("A state court's assertion of jurisdiction exposes defendants to the State's coercive power, and is therefore subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))). Accordingly, in addition to its own decisions, the Supreme Court of Texas relies on personal jurisdiction precedent from the United States Supreme Court and other federal courts. *PHC-Minden*, 235 S.W.3d at 166.

The exercise of personal jurisdiction satisfies due process if (1) the nonresident defendant established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe*, 326 U.S. at 316). When a nonresident defendant purposefully avails itself of the privileges and benefits of conducting business in a foreign jurisdiction, its contacts are sufficient to confer the forum with personal jurisdiction over the defendant. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Only the defendant's

7

purposeful contacts are relevant to the inquiry; unilateral activity of another party or third person, as well as random, isolated, or fortuitous contacts by the defendant, are insufficient to prove the defendant purposefully availed itself of the forum. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 (Tex. 2016) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

Once minimum contacts have been established, the exercise of jurisdiction will typically comport with traditional notions of fair play and substantial justice. *Spir Star*, 310 S.W.3d at 878 (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)). To establish the contrary, the defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* at 879 (quoting *Guardian Royal*, 815 S.W.2d at 231). Those considerations include: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 878 (citing *Guardian Royal*, 815 S.W.2d at 231).

A defendant's contacts with the forum can give rise to either general or specific jurisdiction. *Cornerstone Healthcare*, 493 S.W.3d at 71. The central inquiry under specific jurisdiction is the relationship between the defendant, the forum state, and the plaintiff's claim. *Id.* (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007)). General jurisdiction, on the other hand, does not require a nexus between the

defendant's in-state contacts and the plaintiff's claim; instead, the focus is solely on the defendant's contacts with the forum. *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)); *PHC-Minden*, 235 S.W.3d at 168.

Specific jurisdiction, which is alleged here, is appropriate when the plaintiff's claim arises from or relates to the defendant's contacts with the forum state. *Cornerstone Healthcare*, 493 S.W.3d at 71 (citing *Spir Star*, 310 S.W.3d at 873). To satisfy this requirement, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Old Republic*, 549 S.W.3d at 560 (citing *Moki Mac*, 221 S.W.3d at 585).

The plaintiff bears the initial burden of alleging facts that establish the trial court's jurisdiction. *Searcy*, 496 S.W.3d at 66 (citing *Retamco Operating*, 278 S.W.3d at 337). The burden then shifts to the defendant to negate all bases for personal jurisdiction that exist in the plaintiff's pleading. *Id.* (citing *Retamco Operating*, 278 S.W.3d at 337). If the defendant disproves the plaintiff's jurisdictional allegations, then the plaintiff should present evidence in support of the petition's allegations. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). In a specific jurisdiction analysis, "we must analyze the defendant's contacts 'on a claim-by-claim basis' to determine whether each claim arises out of or is related to the defendant's minimum contacts." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (quoting *Moncrief Oil*, 414 S.W.3d at 150).

### III.     ANALYSIS

The sole issue before us is whether Douglas and Mark's contacts with Texas are

9

sufficient to confer the trial court with specific jurisdiction over them as to Capital Title's unjust enrichment claim. Although the parties highlight the facts that support their respective positions, the facts themselves are not in dispute.

## A.    Purposeful Availment

Douglas and Mark contend that they did not purposefully avail themselves of the privilege of conducting activities in Texas because Carolyn initiated the sale, and they "merely responded and complied with requests initiated by [Capital Title] to effectuate the sale of the [p]roperty owned by [their] stepmother and father prior to his death." At first blush, their argument has some appeal.

Robert Sr. and Carolyn's decision to purchase real property in Texas created a continuing relationship for them with the state. *See Retamco Operating*, 278 S.W.3d at 340 ("Republic, by purchasing Texas real property, has purposefully availed itself of the privilege of conducting activities in Texas."). But we cannot attribute their unilateral decision to Douglas and Mark. *See Cornerstone Healthcare*, 493 S.W.3d at 70.

Likewise, Carolyn elected not to probate Robert Sr.'s will, effectively forgoing her right to inherit his interest in the property and keep all the proceeds from the sale. *See id.* Stated differently, Douglas and Mark only acquired an interest in the property because Carolyn decided not to probate the will. *See* TEX. EST. CODE ANN. § 201.003(c). The fact that they passively acquired an interest in the property could be described as fortuitous. *See Johnson v. Kindred*, 285 S.W.3d 895, 902 (Tex. App.—Dallas 2009, no pet.) (holding trust beneficiary did not purposefully avail himself because trustee unilaterally selected Texas property for purchase and beneficiary was merely a "passive investor").

10

Finally, Carolyn alone initiated the sale and engaged Capital Title to issue a title policy and serve as the escrow agent. *See Cornerstone Healthcare*, 493 S.W.3d at 70. Indeed, it was Capital Title that informed the four brothers about the impending sale and their respective interests in the proceeds if the sale went through. Up to this point, we agree that Douglas and Mark did not purposefully avail themselves of the privileges of doing business in Texas.

But regardless of how they initially became involved with the transaction, by signing the deed and accepting the proceeds, the brothers made a purposeful decision to avail themselves of Texas law and profit from their ownership interests in Texas real property. Although Robert Sr. was a resident of Kansas at the time of his death, Texas law controlled the descent and distribution of his interest in the property. *See Nw. Nat'l Cas. Co. v. Doucette*, 817 S.W.2d 396, 399 (Tex. App.—Fort Worth 1991, writ denied) ("[Q]uestions of descent and distribution are controlled by the state where the realty of the estate is located." (citing *Martinez v. Gutierrez*, 66 S.W.2d 678, 683 (Tex. [Comm'n Op.] 1933))). Thus, Douglas and Mark benefitted under Texas's intestacy laws, and their interests in the property vested immediately upon their father's death approximately a year prior to the sale. *See* TEX. EST. CODE ANN. §§ 101.001(b), 201.003(c).

The record reflects, through a series of emails, that Douglas and Mark were deliberate in their decision to join the transaction, waiting approximately a month after the closing date to execute the general warranty deed. Before signing the deed, the brothers asked Capital Title to send them the settlement statement and their father's will. Douglas then requested to review "current documents that demonstrate owners of record for this

11

property." In a subsequent email from Capital Title to the brothers, the escrow officer asked them to confirm whether they were "ready to move forward with signing the documentation" because the buyers were growing impatient. In response, Douglas asked Capital Title to confirm how the proceeds would be distributed. Capital Title replied that Carolyn would receive half and Douglas and Mark would split the other half because "Robert [Jr.] and David did not request payment." Capital Title reiterated that "the buyers are anxious to finalize this transaction."

"Jurisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Michiana*, 168 S.W.3d at 785 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). But "a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)). Here, if the brothers wanted to avoid jurisdiction in Texas with respect to this transaction, then they could have simply refused to sign the deed. And if they wanted to sever all ties to Texas with respect to the property, then they could have executed a quitclaim deed in favor of Carolyn or their brothers. *See Enerlex, Inc. v. Amerada Hess, Inc.*, 302 S.W.3d 351, 354 (Tex. App.—Eastland 2009, no pet.) ("A quitclaim deed conveys the grantor's right in that property, if any." (citing *Geodyne Energy Income Prod. P'ship I–E v. Newton Corp.*, 161 S.W.3d 482, 486 n.12 (Tex. 2005))).

Instead, they elected to sign the general warranty deed and convey their interests to the buyers in exchange for a portion of the sales proceeds. In doing so, they established

12

an ongoing relationship between themselves, the buyers, and Texas. *See Stumhoffer v. Perales*, 459 S.W.3d 158, 165 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (explaining that "a general warranty deed expressly binds the grantor to defend against title defects created by himself and all prior titleholders"). This decision was made solely by the brothers; it cannot be attributed to anyone else. *See Cornerstone Healthcare*, 493 S.W.3d at 70. Accordingly, we conclude that by choosing to participate in the transaction, Douglas and Mark purposefully availed themselves of the privileges and benefits of conducting activities in Texas.

**B.     Substantial Connection**

The brothers argue that their potential liability "does not arise from or relate to any of [their] contacts with Texas" because Capital Title was relying on the settlement statement executed by Carolyn—as opposed to any representations made by them— when it distributed the proceeds. Although they couch their argument in the correct language, Douglas and Mark ask us to engage in a merits-based analysis that focuses on whether their conduct proximately caused the other parties' injuries. The Supreme Court of Texas has specifically eschewed this approach to the relatedness inquiry. *See Moki Mac*, 221 S.W.3d at 583 (rejecting a proximate cause test as exceeding the guarantees of due process and noting that such an analysis would "require a court to delve into the merits to determine whether a jurisdictional fact is actually a legal cause of the injury").

Rather, in adopting "a middle ground," the supreme court requires only "a substantial connection between [the nonresident's] contacts and the operative facts of the

13

litigation." *Id.* at 585 (citing *Guardian Royal*, 815 S.W.2d at 229–33; *Rush v. Savchuk*, 444 U.S. 320, 329 (1980)). Here, Capital Title has alleged that if it distributed the proceeds from the sale in error, then Douglas and Mark were unjustly enriched, and judgment should lie against them for the overpayment. As corresponding parts of the same transaction, there was a substantial connection between Douglas and Mark executing the deed and then accepting the proceeds as consideration for the conveyance. *See id.* It was error for the trial court to conclude otherwise.

## C.    Traditional Notions of Fair Play

Other than making a conclusory statement that exercising jurisdiction over them "would violate traditional notions of fair play and substantial justice," Douglas and Mark did not argue or offer evidence in the trial court to show how defending a suit in Texas would be particularly burdensome to them. *See Spir Star*, 310 S.W.3d at 878 (citing *Guardian Royal*, 815 S.W.2d at 231). To the contrary, Douglas resides in a neighboring state, and Mark acknowledged in his affidavit that he has traveled to Texas in the past to visit his father at the property. *See Moncrief Oil*, 414 S.W.3d at 155 (acknowledging that defending a suit in another state is inherently burdensome to all nonresidents but that "[d]istance alone cannot ordinarily defeat jurisdiction"); *Guardian Royal*, 815 S.W.2d at 231 (noting that "modern transportation and communication have made it much less burdensome" for nonresidents to defend themselves in another jurisdiction). Moreover, because Carolyn, David, and Robert Jr.'s claims against Capital Title will be heard in Texas, it would be more efficient to litigate all the claims as to all the parties in one court, as opposed to three courts, each in a separate state. *See Moncrief Oil*, 414 S.W.3d at

14

155; *Spir Star*, 310 S.W.3d at 879.

Because Douglas and Mark failed to meet their burden to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable," we conclude that the exercise of jurisdiction will comport with traditional notions of fair play and substantial justice. *See Spir Star*, 310 S.W.3d at 879 (quoting *Guardian Royal*, 815 S.W.2d at 231). Accordingly, the trial court erred when it granted Douglas and Mark's special appearance. We sustain Capital Title's issue.

## IV.    CONCLUSION

We reverse the trial court's judgment and remand the case for further proceedings.

GINA M. BENAVIDES
Justice

Delivered and filed on the
17th day of February, 2022.

15