Affirmed and Opinion filed April 10, 2008








Affirmed and Opinion filed April 10, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00527-CV

_______________

 

GREENFIELD ENERGY, INC., GREENFIELD ENERGY, INC., and
GREENFIELD OIL TRINIDAD, LTD., Appellants

 

V.

 

LAWRENCE DUPREY and CL FINANCIAL, LTD., Appellees

                                                                                                    
                                           

On Appeal from the 295th District Court

Harris County, Texas

Trial Court Cause No. 2005B69248

                                                                       
                                                                        

 

O P I N I O N








This is an appeal from an order
granting the special appearances of appellees, a foreign company and foreign
citizen.  Appellants contend that the Texas contacts of two foreign subsidiary
companies, wholly-owned by the foreign company, should be imputed to appellees
for jurisdictional purposes.  Appellants further contend that appellees= contacts with Texas are sufficient
to support the jurisdiction of a Texas court.  We conclude that imputation of
the contacts of the subsidiaries to appellees is not warranted on this record. 
We further determine that appellees do not have sufficient minimum contacts
with Texas to sustain special or general jurisdiction.  We therefore affirm the
trial court=s order granting appellees= special appearances.

I.  Factual
and Procedural Background

On January 22, 2007, Greenfield[1] 
sued Primera East Brighton Ltd. (APEBL@), Primera Oil & Gas Ltd. (APOGL@), EOG Resources, Inc. (AEOG@), Lawrence Duprey (ADuprey@), and CL Financial, Ltd. (ACL Financial@) alleging (a) breach of
contract, (b) tortious interference with contract, (c) conspiracy to
interfere with business relations, (d) fraud, (e) unjust enrichment,
(f) negligent misrepresentation, (g) promissory estoppel,
(h) quantum meruit, and (i) alter ego, single business enterprise,
and sham to perpetrate fraud.  As relevant to this appeal, Greenfield asserted
that jurisdiction was proper because PEBL and POGL (collectively, Athe Primera entities@) allegedly

operated .
. . as the Aalter ego@ of
CL Financial Limited and Lawrence Duprey, the agent of CL Financial Limited and
Lawrence Duprey[,] or as part of a single business enterprise with CL Financial
Limited and Lawrence Duprey and any and all contacts with Houston, Harris
County, Texas made by Defendant Primera should be imputed to Defendants CL
Financial Limited and Lawrence Duprey.

CL Financial and Duprey filed special
appearances, and the trial court conducted a hearing on April 30, 2007.  The
trial court granted the special appearances on June 12, 2007 and subsequently
filed factual and legal findings on July 11, 2007.  This appeal timely ensued. 

A.        The
Parties








Lawrence Duprey is a resident citizen
of the Republic of Trinidad and Tobago who does not live and has never worked
in Texas.  He owns the controlling interest in CL Financial, which is a holding
company based in and incorporated under the laws of the Republic of Trinidad
and Tobago, with no offices or employees in Texas.  In turn, CL Financial is
the sole shareholder of the Primera entities.[2] 
Duprey is also chairman of the board of CL Financial and the Primera entities. 
Pat Acham, a resident of the Republic of Trinidad and Tobago, is the chief
executive officer of both the Primera entities.  Neither of the Primera
entities have offices or employees in Texas.  

Greenfield Energy, Inc. (AGreenfield Canada@) is a Canadian corporation.  In
August 2003, two principals of this corporation, Canadian residents Ed Wenger
and Larry Smyth, were introduced to Acham by a Houston resident, Jim
Oberkircher.  In September 2003, Wenger and Oberkircher formed a Houston
company, also named Greenfield Energy, Inc. (AGreenfield Houston@),[3]
and began negotiating with Acham regarding the rights to the property at the
center of this dispute, an oil and gas property located off the coast of
Trinidad, referred to by the parties as the AEast Brighton block.@  The dispute in this case arises
from the drilling rights to this property and an agreement between the Primera
entities and Greenfield Canada and Greenfield Oil Trinidad, Ltd. (AGreenfield Trinidad@). 

B.        The
June Letter Agreement








In June 2004, Acham and Smyth signed
a letter agreement (the AJune Letter Agreement@).[4] 
Acham drafted the agreement and signed it in his capacity as chief executive
officer of both Primera entities.  The June Letter Agreement indicated that
Greenfield Canada was signing  it Aon behalf of a company to be formed
under the laws of the Republic of Trinidad and Tobago.@  The agreement provided that the
parties would each undertake certain actions in order to Anegotiate and consummate@ a formal agreement and an Operating
Agreement by August 31, 2004.[5]  The letter
also contained the following provision:

The subject
matter described herein is intended by Primera and Greenfield to remain
confidential, not to be disclosed to any other party without the written
consent of Primera and Greenfield, unless such disclosure is required by the
Government or of the Government to whose jurisdiction any party hereto is
subject or of any agency thereof.

According to Acham, he faxed this
letter to Greenfield Canada from the Houston offices of EOG when he was there
discussing development of other oil and gas prospects with EOG  on June 29,
2004.  It is primarily the alleged breach of this letter agreement and the
alleged tortious interference with this agreement by CL Financial, Duprey, and
EOG for which the Greenfield entities have sued.  

C.        The
Acquisition and Transfer of the East Brighton Block

Much of Greenfield=s arguments regarding imputing the
contacts of the Primera entities to CL Financial and Duprey rely on ownership
of the rights to the East Brighton block.  Therefore, a brief history
surrounding the acquisition and subsequent transfer of these rights provides
the necessary context for this case. 

$                  
In 1999, CL Financial purchased
drilling and development rights to the East Brighton block, and also purchased
a company named Premier Oil Fields of Trinidad, Ltd., subsequently renamed
POGL.  At the time CL Financial acquired the rights to the block, an existing
joint operating agreement  was in place between the previous operator and
Petroleum Company of Trinidad & Tobago Ltd. (APetrotrin@), which required Petrotrin=s consent to any transfer of the interests to a
non-affiliated company, as well as the consent of the government of Trinidad
and Tobago to any transfer.








$                  
In early March of 1999, CL
Financial requested the government=s
consent to this transfer, which was granted in April of 1999.  In July of 1999,
CL Financial, the previous operator, and Petrotrin executed a novation to the
joint operating agreement, substituting CL Financial into the agreement  in
place of the prior operator.

$                  
CL Financial apparently intended
to transfer the East Brighton assets to POGL because POGL started accounting
for these assets in 1999.  In 2001, the Primera entities began assembling the
paperwork necessary for the transfer.  In April 2002, CL Financial requested
Petrotrin=s consent to the transfer.  Petrotrin consented to the
transfer of CL Financial=s rights to POGL in June 2002.  Shortly thereafter, CL
Financial sought governmental consent to the transfer.

$                  
At some point during this process,
the decision was made to place the drilling rights in PEBL, a newly-formed
wholly-owned subsidiary of CL Financial.

$                  
In September 2003, Pat Acham,
chief executive officer of both Primera entities, wrote to Petrotrin seeking
consent for the assignment of the East Brighton rights to PEBL.  Shortly
thereafter, Tim Gabriel of POGL sought governmental consent to the transfer.

$                  
In November 2003, a government
official contacted CL Financial, explaining that inconsistent transfers of the
East Brighton rights had been requested.  The official explained that CL
Financial had requested permission for an assignment of the rights to POGL in
2002, and POGL had requested transfer of CL Financial=s rights to PEBL in 2003.  

$                  
Because Petrotrin=s  consent was unnecessary to transfer the block to an
affiliate, CL Financial informed Petrotrin of its intent to transfer its rights
to PEBL.  By June of 2004, POGL was awaiting governmental consent to the
transfer so it could finalize exploration and development of the property.

$                  
In mid-2004, POGL discovered that
it did not have a copy of the original assignment paperwork conveying the
previous operator=s interest to CL Financial when the purchase was made
of the drilling rights in 1999.  In October of 2004, POGL determined that no
such paperwork had been drafted or filed and that technically the rights to the
East Brighton block legally belonged to the prior operator.  To resolve this
problem, two deeds of assignment were drafted: (1) a retroactive transfer from
the previous operator to CL Financial, and (2) a prospective transfer from CL
Financial to PEBL.  








$                  
In October 2005, the two transfers
were finally properly documented with appropriate deeds of assignment and the
requisite government approvals.  Later, a novation was signed formally
substituting PEBL for CL Financial in the joint operating agreement.

D.        The
Trial Court=s Findings of Fact and Conclusions of Law

On April 30, 2007, the trial court
conducted a hearing on CL Financial and Duprey=s special appearances.  At the
request of the parties, on July 11, 2007, the trial court made findings of
facts and conclusions of law on their special appearances.  Regarding specific
jurisdiction, the trial court made the following findings.

1.         Plaintiffs= Allegations

In this lawsuit, plaintiffs allege that Adefendants@ traveled to Texas and executed the June Letter
Agreement or that the A[c]ontract at issue was executed by Defendants in
Texas.@  Plaintiffs also allege that Adefendants@ Asubsequently traveled to Houston, Texas@ to interfere with plaintiffs= contractual rights.  However, neither Duprey nor CL
Financial signed either the June Letter Agreement or the memorandum of
understanding.  Additionally, there is no evidence linking either Duprey or CL
with the interference claims or with Texas.  The Court finds that there is no
evidence supporting these jurisdictional allegations.

Plaintiffs allege that Duprey and CL [Financial] Awrongfully directed others to execute the agreements@ with plaintiffs and conspired with EOG to interfere
with the June Letter Agreement.  The Court finds that there is no evidence of
Duprey or CL [Financial] directing anyone to perform any act of jurisdictional
significance.

Finally, plaintiffs allege that Duprey and CL [Financial] committed
fraud against them and negligently provided false information to them.  The
Court finds that there is no evidence that Duprey or CL [Financial] were
involved in any fraud or misrepresentations.  Greenfield cannot point to any
(1) evidence of representations that Duprey or CL [Financial] made to them, (2)
evidence of defendants= intent to deceive, or (3) evidence of plaintiffs= reliance upon the putative representations.

2.         Negotiations with EOG

Greenfield argues that CL Financial, through Gita Sakal, negotiated a
confidentiality agreement with EOG.  However, Greenfield=s evidence does not show a jurisdictional contact,
because EOG Trinidad initiated the contact, CL Financial is not a party to the
confidentiality agreement, and the confidentiality agreement is not a contact
with Texas.








The confidentiality agreement upon which Greenfield focuses is between
[PEBL] and EOG Resources Trinidad Limited; CL Financial did not sign it.  When
EOG Trinidad received its copy of the agreement, Acham sent it with a cover
letter on [PEBL] letterhead.  Further, even if CL [Financial] had signed the
agreement, it would be a contact with Trinidad, because the agreement is with
EOG Trinidad.

3.         The Memorandum of Understanding

Greenfield also argues that a December 2, 2003 memorandum of
understanding between the APrimera Group
of Companies@ and Greenfield Houston is a CL Financial contact with
Texas.  Greenfield suggests that the Amajority
of negotiations [took] place in Texas.@ 
The evidence that Greenfield offers for this contention is a reference by Larry
Smyth that Jim Oberkircher began these negotiations Ain November, 2003 from Houston, Texas.@  This evidence does not show that a majority of the
negotiations took place in Texas.  In fact, Oberkircher himself testified that
he and Ed Wenger initiated the contact with Acham in Trinidad, never met with
Acham anywhere but Trinidad, and - most importantly - never had contact with CL
Financial, Duprey, or anyone acting as an agent for either.  There is no
credible evidence that the negotiations took place in Houston - all of the
credible evidence shows that Trinidad was where the memorandum of understanding
was negotiated.  In any event, all of the evidence is that Greenfield initiated
this contact.  It is not a Texas contact for CL Financial, or any other
organization.

In addition to Oberkircher=s
testimony that Greenfield never contacted anyone at CL [Financial], the plain
fact remains that CL Financial did not sign the [m]emorandum of
[u]nderstanding.  Acham signed the memorandum for the APrimera Operating Group of Companies, Ltd.@  Primera Operating Group is not, as Greenfield points
out, the proper name of any of the Primera companies, but that does not matter
for jurisdictional purposes.  Use of the name might lead to confusion between
the various Primera companies, but it is not evidence that CL Financial signed
the memorandum.








The evidence does not show that Primera was acting as CL Financial or
as an agent of CL Financial.  Primera performed actions Aon behalf@ of
CL Financial in the same sense that any wholly-owned subsidiary performs
actions Aon behalf@ of
its sole shareholder, which is to say that Primera performed actions which
would benefit its parent company and sole shareholder.  The evidence does not
show any exercise of control that exceeds what would normally be expected in a
parent-subsidiary corporate relationship.  Additionally, none of this evidence
refers to the memorandum of understanding, so it does not support Greenfield=s argument that CL Financial, in effect, signed the
memorandum.

4.         Gaffney, Cline

In February 2000, Acham accepted a fee schedule from Gaffney, Cline
& Associates, a technical consulting firm, by signing it on behalf of CL
Financial and Primera.  This is not a jurisdictional contact because Greenfield
is not complaining about the representations made based on the Gaffney, Cline
report.  Neither Gaffney, Cline nor the representations themselves are
substantially related - or related at all - to Greenfield=s claims.

The trial court further found that
there was no evidence of systematic and continuous contacts that would support
general jurisdiction over Duprey or CL Financial.  Specifically, the trial
court found as follows regarding the imputation of the contacts of the Primera
entities to CL Financial or Duprey:

1.         Alter Ego and Single Business Enterprise

The evidence shows that the defendants meet the Texas tests for
corporate separateness.  CL [Financial], [POGL], and [PEBL] are separate and
distinct companies.  [POGL] and [PEBL] have management that is independent from
that of CL Financial Limited.  The testimony showed that:

(1)       Acham makes all of the hiring decisions for the Primera
companies and that CL [Financial] has no influence in those decisions.

(2)       Each of the Primera companies generate[s] separate annual
audits of [its] finances.

(3)       Each of the Primera companies file[s] separate tax returns.

(4)       CL [Financial] does not itself loan money to any of the
Primera entities.

(5)       [POGL]=s payroll system is completely independent from that
of CL Financial.

(6)       CL Financial and the Primera companies keep separate
accounting records.

(7)       The daily operations of the Primera companies and CL
Financial do not overlap.

(8)       There are structural barriers between the Primera entities
and CL Financial.








(9)       CL [Financial] and the Primera companies have neither common
business departments nor common shareholder or board meetings.

(10)     CL [Financial] and the Primera entities do not share any
common employees.

(11)     The Primera companies and CL [Financial] have no undocumented
fund transfers.

(12)     Primera and CL [Financial] do not combine profits or losses.

The Court finds,
as a matter of fact, that there is no evidence supporting any type of alter ego
or single business enterprise theories with respect to CL Financial, [POGL],
and [PEBL].

2.         Agency

The testimony showed that Acham made the day-to-day decisions at both Primera
entities.  The CEOs of CL Financial=s
subsidiaries exercised independent judgment as to how their companies are run. 
During the period in which CL Financial held the East Brighton rights, Primera
was conducting operations on the prospect.  Primera, unaware that there was a
problem with the transfer of the East Brighton interest, was managing
day-to-day activities with respect to the interest.  The intent of both CL
Financial and Primera was for Primera to handle all of the oil and gas
activities in the block.  So, for instance, when it was time to contract for
test wells on the prospect, it was [POGL] that hired Halliburton.  There is no
evidence that CL [Financial] exerted control over the details of the work of
the Primera entities.

Finally, the trial court made the
following legal conclusions:

The Court finds that Lawrence Duprey does not conduct business in the
State of Texas, and thus lies outside of the reach of Texas=s long-arm statute.  However, even if Duprey w[ere]
doing business within the [S]tate, his contacts with the [S]tate were not
purposeful.  The [C]ourt finds that Duprey=s
contacts were random, isolated and fortuitous.  Additionally, there is no
evidence that Duprey sought any benefit from Texas state law, such that he
impliedly consented to the jurisdiction of the Texas courts.  Duprey had no
contacts with Texas that were related to plaintiffs= allegations.  The Court finds that the facts do not
justify imputing the jurisdictional contacts of any other party to Duprey.








Like Duprey, CL Financial does not conduct business in the State of
Texas, and thus does not fall within the reach of the state long-arm statute. 
Even if that were not the case, CL[ Financial]=s contacts with the State were not purposeful.  The Court finds that
its contacts were random, isolated and fortuitous.  Additionally, there is no
evidence that CL [Financial] sought any benefits from Texas state law, such
that it impliedly consented to the jurisdiction of the Texas courts.  Like
Duprey, CL [Financial] had no contacts with Texas that were related to plaintiffs= allegations.  The Court finds that the facts do not
justify imputing the jurisdictional contacts of any other party to CL
[Financial].

II.  Issues
Presented

In its first issue, Greenfield
contends the trial court erred in finding that Duprey and CL Financial do not
have sufficient minimum contacts with Texas to justify an exercise of specific
or general jurisdiction over them.  Specifically, Greenfield asserts that (a)
the Primera entities= contacts should be imputed to Duprey and CL Financial, (b)
these imputed contacts support general jurisdiction, and (c) both Duprey and CL
Financial=s own contacts support the exercise of specific jurisdiction.   In its
second issue, Greenfield argues that the trial court erred in finding that
asserting jurisdiction over appellees would not comport with traditional
notions of fair play and substantial justice.

III. 
Standard of Review

Whether a trial court has personal
jurisdiction over a defendant is a question of law.  Schott Glas v. Adame,
178 S.W.3d 307, 312 (Tex. App.CHouston [14th Dist.] 2005, pet. denied), abrogated on
other grounds by PHC-Minden, L.P. v. Kimberly-Clark Corp., 235 S.W.3d 163,
169 (Tex. 2007).  The trial court, however, must frequently resolve questions
of fact before deciding the jurisdictional question.  BMC Software Belg.,
N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).  If the trial court rules
on a special appearance and issues findings of fact and conclusions of law, we
review the findings of fact on legal and factual sufficiency grounds and review
the conclusions of law de novo.  See Silbaugh v. Ramirez, 126 S.W.3d 88,
94 (Tex. App.BHouston [1st Dist.] 2002, no pet.) (citing BMC Software, 83 S.W.3d
at 794). 








Personal jurisdiction is proper if a
defendant has established Aminimum contacts@ with Texas and the exercise of
jurisdiction comports with Atraditional notions of fair play and substantial justice.@  Am. Type Culture Collection,
Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002) (citing Int=l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154,
158 (1945)).  AThe purpose of the minimum-contacts analysis is to protect the defendant
from being haled into court when its relationship with Texas is too attenuated
to support jurisdiction.@  Id.  Such an analysis requires that a defendant Apurposefully avail@ itself of the privilege of
conducting activities within the state of Texas, thus invoking the benefits and
protections of Texas law.  Id. 

Personal jurisdiction exists if the
nonresident defendant=s minimum contacts give rise to either specific or general
jurisdiction.  See PHC-Minden, 235 S.W.3d at 166.  Specific jurisdiction
is established if the defendant=s alleged liability arises from or is related to an activity
conducted within the forum.  See id.  General jurisdiction, in contrast,
arises from continuous and systematic contacts with the forum such that the
forum may exercise personal jurisdiction over the defendant even if the cause
of action did not arise from or relate to activities conducted in the forum
state.  See id.  

IV. 
Analysis

As noted above, Greenfield relied on
theories of agency, alter ego, and single business enterprise to support
general jurisdiction over CL Financial and Duprey, as well as alleging specific
jurisdiction over both.  A defendant asserting a special appearance bears the
burden of proving that its contacts with the forum state do not satisfy the
minimum contacts test.  See, e.g., Am. Type Culture
Collection, Inc., 83 S.W.3d at 806.  But Athe party seeking to ascribe one
corporation=s actions to another by disregarding their distinct corporate entities
must prove this allegation.@  BMC Software, 83 S.W.3d at 798 (alter ego theory); see
also Coleman v. Klöckner & Co. AG, 180 S.W.3d 577, 588 (Tex. App.CHouston [14th Dist.] 2005, no pet. )
(agency theory).  Because Greenfield relies first on the imputation of the
Primera entities= contacts to CL Financial and Duprey to meet the minimum
contacts test, we begin our analysis with the theories alleged by Greenfield to
support such imputation. 








A.        Imputing the Contacts of the Primera Entities 

1.         Alter Ego Theory

Greenfield first asserts that the
Primera entities= jurisdictional contacts should be imputed to Duprey and CL
Financial based on an alter ego theory.[6]  The Texas
Supreme Court recently clarified the factors relevant to such an inquiry:

To Afuse@ the parent
company and its subsidiary for jurisdictional purposes, the plaintiffs must
prove the parent controls the internal business operations and affairs of the
subsidiary.  But the degree of control the parent exercises must be greater
than that normally associated with common ownership and directorship; the
evidence must show that the two entities ceased to be separate so that the
corporate fiction should be disregarded to prevent fraud or injustice.

PHC-Minden, 235 S.W.3d at 175 (quoting BMC
Software, 83 S.W.3d at 799).  The Court also emphasized that a Asubsidiary corporation will not be
regarded as the alter ego of its parent merely because of stock ownership, a
duplication of some or all of the directors or officers, or an exercise of the
control that stock ownership gives to stockholders.@  Id. (quoting Gentry v.
Credit Plan Corp. of Houston, 528 S.W.2d 571, 573 (Tex. 1975)).  








As noted above, the trial court found
the Primera entities and CL Financial to be separate and distinct companies,
with independent management, boards of directors, and accounting practices. 
Our review of the record finds support for these findings.  For example,
Patrick Chin, the financial controller of Primera Oil Field Management
Services, another of the entities owned by CL Financial that provides
management and financial services to several of its subsidiaries, including, as
is relevant here, the Primera entities, testified in a deposition that there
was no overlap between the daily operations of CL Financial, POGL, and PEBL. 
He stated that the Aday-to-day@ decisions of both Primera entities were made by Acham as
their chief executive officer.  Chin testified that the Primera entities and CL
Financial file separate tax returns, keep separate accounts, and have separate
home offices.  According to Chin, CL Financial billed the Primera entities for
legal services provided by Gita Sakal, the legal officer for CL Financial.  The
Primera entities paid for these services.  Chin additionally knew of no
transfers of funds between the companies.  

Sakal=s deposition testimony confirmed much
of Chin=s description of the relationship
between the Primera entities and CL Financial.  According to her, Acham was
authorized to enter into the June Letter Agreement because he was Acharged with responsibility of the
operations of the company.@  Acham testified in a deposition that CL Financial was not
involved in the day-to-day drilling activities, even when it was technically
still the owner of the East Brighton block. Acham acknowledged that Duprey, as
chairman of the Primera entities, had the Afinal say.@  But Acham emphasized that it was
Acham himself who was charged with running the day-to-day operations of the
Primera entities:

            Q:        During the entire time once you
took the job at Primera and you came down to Trinidad B during the entire time you were there or that you
have been there, has Mr. Duprey dictated to you the way you are to run Primera?

A:        No.

Q:        When you have had discussions with Mr.
Duprey, what has been his role concerning Primera?

A:        He has always acted as an officer, chairman
of Primera, providing guidance and business advice whenever necessary.

. . .

Q:        When you went to Trinidad and started your
work, who to your understanding actually had held or initially held the license
for the drilling opportunity in the East Brighton?  What was your understanding
at the time?

A:        CL Financial.

Q:        And what was your understanding of CL=s intent and desire with respect to the interest in
the East Brighton fields?

A:        CL=s
intent was to have Primera handle all their oil and gas activities.  They
actually passed everything on to Primera for Primera to handle.

. . .

Q:        As far as day-to-day operations of the East
Brighton block, who was responsible for those day-to-day operations as of the
date of the [June Letter Agreement]?

A:        Primera.








Thus, even though CL Financial may
have retained legal ownership of the East Brighton block during the time that
the Primera entities and Greenfield negotiated and entered into the June Letter
Agreement,[7] there is no
indication in the record that either of the Primera entities were operating on Abehalf@ of CL Financial.  Finally, Duprey
stated in his deposition that his only involvement with the Primera entities
was as chairman of the entities= respective boards. 

Greenfield has not established that
CL Financial controlled the internal business operations and affairs of the
Primera entities to any extent greater than that normally associated with
common ownership and directorship.  See id.  Accordingly, the trial
court did not err in concluding that there is Ano evidence supporting any type of
alter ego or single business enterprise theories with respect to CL Financial,
[POGL], and [PEBL].@  We therefore conclude that the Primera entities= contacts cannot be imputed to CL
Financial under the alter ego theory alleged by Greenfield.








The same facts establishing that the
Primera entities are separate and distinct corporations also negate general
jurisdiction over Duprey individually based on a theory of alter ego.  See,
e.g., D.H. Blair Inv. Banking Corp. v. Reardon, 97 S.W.3d 269, 277
(Tex. App.CHouston [14th Dist.] 2002, pet. dism=d w.o.j.) (stating that A>jurisdiction over an individual
generally cannot be based on jurisdiction over a corporation with which he is
associated unless the corporation is the alter ego of the individual=@) (quoting Vosko v. Chase
Manhattan Bank, N.A., 909 S.W.2d 95, 99 (Tex. App.CHouston [14th Dist.] 1995, writ
denied)).  Although a corporate officer is not protected from the exercise of
specific jurisdiction if the officer engaged in tortious or fraudulent conduct
directed at the forum state,[8] we address
this issue separately infra, when we consider whether Duprey negated the
exercise of specific jurisdiction.    

2.         Agency
Theory

Greenfield next asserts that the
Primera entities= contacts with Texas should be imputed to Duprey and CL
Financial for jurisdictional purposes because the Primera entities served as
the agents of Duprey and CL Financial.  In conducting a jurisdictional inquiry,
an agent=s contacts may be imputed to a
principal to establish the requisite minimum contacts.  See Coleman, 180
S.W.3d at 588.  But Aagency will not be presumed, and the party asserting the
relationship has the burden of proving it.@  Id.  








Generally, whether
one describes the theory for imputing one corporation=s contacts to
another as a theory of agency or alter ego, the critical test remains that of
the right or exercise of control.  See Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 335, 45 S. Ct. 250,
250B51 (1925) (rejecting agency theory
for imputing corporation=s contacts to sole shareholder where the existence of the
company Aas a distinct corporate entity is,
however, in all respects observed@); Bank of Am. v. Whitney Cent.
Nat=l Bank, 261 U.S. 171, 173, 43 S. Ct. 311, 312 (1923) (AThe jurisdiction taken of foreign
corporations, in the absence of statutory requirement or express consent, does
not rest upon a fiction of constructive presence, like >qui facit per alium facit per se.=@[9]); PHC-Minden, 235 S.W.3d at
175 (rejecting the Asingle business enterprise@ jurisdictional theory and describing
Athe relevant factors for
jurisdictional veil-piercing,@ including the extent to which the Athe parent controls the internal
business operations and affairs of the subsidiary@ or conversely, whether the
subsidiary is Aseparate and distinct from its parent corporation@); BMC Software, 83 S.W.3d at
799 (considering Aalter ego@ theory and concluding that A[t]o >fuse= the parent company and its
subsidiary for jurisdictional purposes, the plaintiffs must prove the parent
controls the internal business operations and affairs of the subsidiary@); K.D.F. v. Rex, 878 S.W.2d
589, 597 (Tex. 1994) (orig. proceeding) (holding that a Kansas general
partnership created to hold securities on behalf of a Kansas governmental
entity and operating solely upon the direction of the governmental entity with
no discretion of its own was an agent of that entity and was not subject to
Texas jurisdiction in its individual capacity); Gentry, 528 S.W.2d at
573 (explaining that a subsidiary corporation will be regarded as the alter ego
of its parent Awhere management and operations are assimilated to the extent that the
subsidiary is simply a name or conduit through which the parent conducts its
business . . . @); Coleman, 180 S.W.3d at 588
(AThe critical element of an agency
relationship is the right to control, and the principal must have control of
both the means and details of the process by which the agent is to accomplish
his task in order for an agency relationship to exist.@).  Thus, the pertinent inquiry in
this case is whether CL Financial or Duprey controlled both the means and
details of the Primera entities= activities regarding the East Brighton block.  And because
agency is not presumed, Greenfield bears the burden of proving that such
control exists.  See Coleman, 180 S.W.3d at 588. 

1.         No
Evidence of Control

For the reasons previously discussed,
we agree with the trial court=s conclusion that there is no evidence CL Financial exerted
control over the details of the work of the Primera entities.  The record
reflects that CL Financial legally owned the rights associated with the East
Brighton block, but it is clear that POGL conducted operations on the prospect
almost from the start.

2.         No
Evidence of Actual or Apparent Authority








There also is no indication that the
Primera entities were authorized to act as agents for either CL Financial
or Duprey.  See id.; Walker Ins. Servs. v. Bottle Rock Power Corp., 108
S.W.3d 538, 549 (Tex. App.CHouston [14th Dist.] 2003, no pet.). AActual authority is created through
written or spoken words or conduct of the principal communicated to the agent.@  Bottle Rock Power Corp., 108
S.W.3d at 550B51.  Apparent authority, on the other hand, Ais created by written or spoken words
or conduct by the principal to a third party.@  Id. at 550.  Greenfield has
not directed us to any written or spoken words or conduct by CL Financial or
Duprey that communicated the Primera entities=actual or apparent authority as their
agents.

3.         No
Evidence of Ratification

AWhether or not an agent is initially
authorized to act on behalf of a principal, the agent=s actions may be attributed to the
principal, for purposes of personal jurisdiction, if the principal later
ratifies the agent=s conduct.@  Id. at 552.  Ratification may occur when a principal
supports, accepts, or follows through on the efforts of a purported agent.  Id.
Greenfield asserts that because the Primera entities= activities in pursuing development
of the East Brighton block benefitted CL Financial and Duprey as the legal
owners of the block, CL Financial and Duprey ratified the alleged agency
relationship.  

This argument, however, ignores the
fact that, rather than retaining the rights to the East Brighton block, CL
Financial ultimately transferred these rights to PEBL.  In fact, as discussed
above, throughout the time that Greenfield claims the Primera entities were
operating as the agents of CL Financial and Duprey, both the Primera entities
and CL Financial were actively seeking to transfer the rights from CL Financial
to the Primera entities.  Thus, there is nothing in the record to support a
ratification theory of agency.

In sum, Greenfield has not
established that CL Financial or Duprey controlled the means and details of the
Primera entities= actions in attempting to develop the East Brighton
prospect.  Moreover, Greenfield has provided no basis from which we may
conclude that the Primera entities were authorized to act as CL Financial or
Duprey=s agents.  Finally, Greenfield has
not established that CL Financial or Duprey ratified the Primera entities= actions regarding the East Brighton
block.  Because an agency relationship cannot be presumed, we conclude that the
trial court properly determined that none existed in this case. 








Greenfield has not provided any
viable basis to impute the contacts of the Primera entities to CL Financial or
Duprey.  We therefore turn to the issue of whether CL Financial or Duprey
themselves have sufficient minimum contacts to support an exercise of
jurisdiction over them.

B.        CL
Financial and Duprey=s Alleged Contacts with Texas

In support of both general and
specific jurisdiction, Greenfield also alleges the following contacts by CL Financial
individually: (a) the confidentiality agreement with EOG, (b) the memorandum of
understanding, and (c) a 2000 reserve analysis related to the East Brighton
block provided by a Houston-based consulting firm.  In addition, Greenfield
asserts that both CL Financial and the Primera entities= East Brighton-related contacts
should all be imputed to Duprey because he Apersonally directed@ these subordinate entities and their
employees to take action directed at Texas.  We address each of these alleged
contacts in turn.

1.         Negotiations
with EOG

Only the defendant=s contacts count in a jurisdictional
analysis.  See Michiana Easy Livin= Country, Inc. v. Holten, 168 S.W.3d 777, 785 (Tex. 2005)
(citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct.
2174, 2184 (1985)).  Here, the negotiations with CL Financial were initiated by
EOG Trinidad, not EOG Houston.  Further, the agreement resulting from these
discussions is an agreement with EOG Resources Trinidad, Ltd.  Thus, even if
this were a jurisdictional contact, we agree with the trial court that this
contact would be a Trinidadian contact.  Moreover, CL Financial is not a party
to the confidentiality agreement, which is between EOG Trinidad and the Primera
entities.  The negotiations with EOG were therefore not a Texas contact of CL
Financial.

2.         Memorandum of Understanding








As the trial court pointed out, the
evidence indicates that the negotiations leading up to the execution of the
memorandum of understanding took place in Trinidad, not Texas.  There is no
evidence that CL Financial was involved in any Texas contact at all.  As the
trial court concluded, AUse of the name [Primera Operating Group of Companies, Ltd.]
might have lead to confusion between the various Primera companies, but it is
not evidence that CL Financial signed the memorandum.@  Thus, the memorandum of
understanding is not a Texas contact  of CL Financial.

3.         2000
East Brighton Block Reserve Analysis

Although Acham purportedly accepted
the Houston-based consulting firm=s fee schedule on behalf of CL
Financial and the Primera entities, he testified that he was not authorized to
commit CL Financial and that it was a mistake to sign the fee schedule as if he
were.  Moreover, this contact predates the relevant time period by more than
three years; the fee schedule was signed in early 2000.  By its own admission,
Greenfield did not become involved in the East Brighton block until late 2003. 
Finally, the record reflects that POGL hired and paid for the services provided
by this consulting firm.  We agree with the trial court that this contact is
not related to the operative facts of this case.  We further conclude that this
contact is a contact of POGL rather than CL Financial. 

4.         Duprey=s AContacts@ with Texas

Greenfield offers little new argument
in this section of its briefing that has not been previously addressed in the
alter ego or agency sections of this opinion, supra.  Greenfield
suggests that Duprey directed and controlled the East Brighton block-related
activities of CL Financial and the Primera entities.  We have already
determined that neither Duprey nor CL Financial directed or controlled the
day-to-day activities of the Primera entities.  We have also concluded that CL
Financial had no jurisdictionally significant contacts with Texas.  Thus, we
need not repeat our analysis here.  There is no evidence that Duprey engaged in
any tortious or fraudulent conduct directed at Texas,[10]
nor that he participated in the negotiation of the memorandum of understanding
or the June letter agreement.








In sum, the trial court did not err
in finding that CL Financial and Duprey do not have sufficient minimum contacts
with Texas to justify an exercise of either general or specific jurisdiction
over them under the Texas long arm statute.  We therefore overrule Greenfield=s first issue, and do not reach its
second issue.  

V. 
Conclusion

We conclude that the contacts of the
Primera entities may not be imputed to CL Financial or Duprey under an alter
ego or agency theory.  Additionally, we conclude  neither CL Financial nor
Duprey have sufficient minimum contacts to justify an exercise of jurisdiction
over them.  Accordingly, we overrule Greenfield=s first issue.  Because of our
disposition of this issue, we need not consider whether exercising jurisdiction
over CL Financial or Duprey would comport with traditional notions of fair play
and substantial justice.[11]  We
therefore affirm the trial court=s judgment granting the special
appearances of CL Financial and Duprey. 

 

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Opinion filed
April 10, 2008.

Panel consists of Justices Yates,
Fowler, and Guzman. 









[1]  For ease of reference, we refer to appellants
collectively as AGreenfield.@





[2]  Both Primera entities are incorporated under the
laws of the Republic of Trinidad and Tobago, as well as having their principal
places of business in Trinidad.  They have made general appearances in this
suit.





[3]  Greenfield Oil Trinidad, Ltd. (AGreenfield Trinidad@)
is also a plaintiff in this dispute.  Greenfield Trinidad is incorporated under
the laws of the Republic of Trinidad and Tobago, with its principal place of
business in Trinidad. There is very little information in the record concerning
this corporation, and none of jurisdictional significance. 





[4]  An earlier memorandum of understanding was signed by
Oberkirker, on behalf of Greenfield Houston, and Acham, on behalf of the APrimera Group of Companies, Ltd.@  Acham acknowledged that this organization did not
officially exist; however, he indicated that he was signing the memorandum in
his capacity as Chief Executive Officer of both the Primera entities. 
Moreover, in March 2004, Oberkircher resigned from Greenfield Houston, closed
down its operating accounts, assumed its leases, and began paying its one other
employee as his own.  Greenfield Houston was not a party to the June Letter
Agreement.





[5]  Additionally, in the letter, Acham stated, AWe are presently awaiting the State=s Ministry of Energy=s consent to have the new company (Primera East Brighton Limited) ratified
to undertake exploration activity in the Block.@





[6]  Greenfield has not asserted a single-business-entity
theory on appeal. 





[7]  Indeed, as noted above, the original deed assigning
the drilling rights from the former operator of the East Brighton prospect to
CL Financial was not filed until July 30, 2005, well after the June letter
agreement and the events transpiring thereafter that form the basis of this
lawsuit.  The deed of assignment, however, operated retrospectively to July 1,
1999, because that is when the parties actually agreed to the assignment.





[8]  See id. (citing Calder v. Jones, 465
U.S. 783, 104 S. Ct. 1482 (1984)).





[9]  AHe who acts
through another acts himself [i.e., the acts of an agent are the acts of the
principal].@  Black=s Law
Dictionary 1249 (6th
ed. 1990). 





[10]  See D.H. Blair Inv. Banking Corp., 97 S.W.3d
at 277B78.





[11]  See Int=l Shoe Co., 326 U.S. at 316,
66 S. Ct. at 158.  Although unnecessary to our resolution of Greenfield=s complaint, our precedent suggests that haling CL
Financial or Duprey into a Texas court would also offend traditional notions of
fair play and substantial justice.  See Moni Pulo Ltd. v. Trutec Oil &
Gas, Inc., 130 S.W.3d 170, 180B81
(Tex. App.CHouston [14th Dist.] 2003, pet. denied); Alenia
Spazio, S.p.A. v. Reid, 130 S.W.3d 201, 220B22  (Tex. App.CHouston [14th Dist.] 2003, pet. denied), cert.
denied, 127 S. Ct. 136 (2006); see also Primrose Drilling Ventures, Ltd.
v. Nealwell Drilling, Ltd., No. 14-98-00618-CV, 2000 WL 890622, at *8 
(Tex. App.CHouston [14th Dist.] July 6, 2000, no pet.) (not
designated for publication).