NUMBER 13-07-00623-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


AARON ANDREW JOINER, Appellant,


v.


COAST PAPER & SUPPLY 

AND CAROL LYNN CARAVA, Appellees.

 


On appeal from the 357th District Court

of Cameron County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Garza and Benavides


Memorandum Opinion by Justice Garza


 Appellant, Aaron Andrew Joiner, complains in this accelerated interlocutory appeal
that the trial court erred in granting special appearances in favor of appellees, Coast Paper
& Supply ("Coast Paper") and Carol Lynn Carava. See Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a)(7) (Vernon Supp. 2007); Tex. R. Civ. P. 120a; Tex. R. App. P. 28.1. By one
issue, Joiner contends that the trial court erred in granting the special appearances
because Texas has general and specific jurisdiction over Coast Paper and Carol. We
affirm.

I. Factual and Procedural Background

 Coast Paper is a California corporation specializing in the sale of wholesale paper
and janitorial supplies. (1) Carol is a California resident and the mother of David Ross
Carava. The underlying lawsuits and ancillary claims pertain to disputes involving real and
personal property transferred from Joiner Food Service, Inc. ("Joiner Food") (2) to DRC
Distributors, Ltd., a Texas limited partnership. (3) See generally Cameron Life Ins. Co. v.
Pactiv Corp., No. 13-05-760-CV, 2007 Tex. App. LEXIS 6773 (Tex. App.-Corpus Christi
Aug. 23, 2007, pet. denied) (mem. op.); DRC Distrib., Ltd. v. Joiner, No. 13-04-038-CV,
2006 Tex. App. LEXIS 1168 (Tex. App.-Corpus Christi Feb. 9, 2006, no pet.) (mem. op.);
Joiner v. Pactiv Corp., No. 13-04-580-CV, 2005 Tex. App. LEXIS 6364 (Tex. App.-Corpus
Christi Aug. 11, 2005, pet. denied) (mem. op.). 

a. The First Lawsuit 

 On May 23, 2000, DRC Distributors and Joiner Food entered into an asset purchase
sale whereby Joiner Food agreed to sell certain real and personal property to DRC
Distributors. Cameron Life Ins. Co., 2007 Tex. App. LEXIS 6773, at *2. Joiner Food held
a deed of trust securing the real property subject to the asset sale, and DRC Distributors
was to make periodic payments on the real estate lien note. Id. at *3.

 After DRC Distributors fell behind on the note, DRC Distributors and DRC Asset
Management, Inc., formerly known as DRC Management Company, Inc., executed a deed
in lieu of foreclosure (the "general warranty deed"), bill of sale, and a comprehensive
mutual release effective December 9, 2002. Id. at *5; see also Pactiv Corp., 2005 Tex.
App. LEXIS 6364, at **2-3. As a condition of the release, DRC Distributors transferred
back to Joiner Food the real and personal property sold along with amounts owed under
the promissory note. In exchange, Joiner Food agreed to release any and all obligations
under the transaction, as well as all other claims or disputes among the parties. In
particular, the parties agreed to refrain from instituting any proceedings against each other
related to this transaction. On December 20, 2002, Joiner recorded the December 9,
2002, general warranty deed in the Cameron County real property records. See Cameron
Life Ins. Co., 2007 Tex. App. LEXIS 6773, at **5-6; Pactiv Corp., 2005 Tex. App. LEXIS,
6364, at *3. 

 On August 25, 2003, Joiner filed a petition for declaratory relief against DRC
Distributors, (4) DRC Management Company (5) (collectively the "DRC Parties"), and David,
seeking to set aside the mutual release. DRC Distrib., Ltd., 2006 Tex. App. LEXIS 1168,
at *2. On October 6, 2003, a no-answer default judgment was rendered against the DRC
Parties and David. Id. The DRC Parties and David filed a restricted appeal with this Court. 
Id. at **1-2. We reversed and remanded the no-answer default judgment, concluding that
Joiner had failed to properly serve the parties with process. Id. at **7-8. 

 On remand, the DRC Parties and David counterclaimed for a declaratory judgment
that the mutual release was in full force and effect and that Joiner had breached the mutual
release and filed a motion for summary judgment. 

b. The Second Lawsuit

 Rather than filing a response to the motion for summary judgment filed by the DRC
Parties and David, Joiner instituted a second lawsuit on October 26, 2006, against the
DRC Parties, David, (6) and against two new parties: Coast Paper and Carol. In this lawsuit,
Joiner alleged, among other things, that: (1) the mutual release was void ab initio; (2)
DRC Distributors was the alter ego of DRC Management Company; (3) DRC Management
Company was the alter ego of David Carava; (4) DRC Management Company was
organized as a sham to perpetrate a fraud; and (5) the DRC Parties, David Cararva, Carol
Carava, and Coast Paper are jointly and severally liable for $868,754.76 in compensatory
damages for breach of contract and $1 million in compensatory damages for breach of
warranty. Carol and Coast Paper filed separate special appearances and original answers
on November 22, 2006. 

 On September 10, 2007, the trial court conducted a hearing on the special
appearances filed by Carol and Coast Paper. On the same day, Joiner filed a first
amended response to both special appearances, which included an affidavit that he
executed himself. After hearing arguments from counsel, the trial court granted both
special appearances. Subsequently, on October 9, 2007, Joiner filed his notice of
accelerated interlocutory appeal challenging the trial court's granting of the special
appearances filed by Carol and Coast Paper. (7) See Tex. Civ. Prac. & Rem. Code Ann. §
51.014(a)(7); Tex. R. Civ. P. 120a; Tex. R. App. P. 28.1. This appeal ensued.II. Standard of Review

 Because the question of a court's exercise of personal jurisdiction over a
nonresident defendant is one of law, we review a trial court's determination of a special
appearance de novo. Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex.
2007) (citing BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002)). 
The plaintiff bears the initial burden of pleading "sufficient allegations to bring a nonresident 


defendant within the provisions of the long-arm statute." Id. at 793. When a special
appearance is filed, the nonresident defendant assumes the burden of negating all bases
of personal jurisdiction asserted by the plaintiff. Moki Mac, 221 S.W.3d at 574; BMC
Software, 83 S.W.3d at 793; El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero,
S.A. de C.V., 82 S.W.3d 622, 628 (Tex. App.-Corpus Christi 2002, pet. dism'd w.o.j.). 

 In this case, Joiner asserts that Texas courts have personal jurisdiction over Coast
Paper and Carol based on their relationship with David and the DRC Parties. When a
plaintiff's assertion of jurisdiction depends on imputing the actions of a resident to a
nonresident, the burden of proof shifts back to the plaintiff. See IRA Res., Inc. v. Griego,
221 S.W.3d 592, 597 (Tex. 2007) ("Texas law does not presume agency, and the party
who alleges it has the burden of proving it.") (citing Buchoz v. Klein, 143 Tex. 284, 184
S.W.2d 271, 271 (Tex. 1944)); BMC Software, 83 S.W.3d at 798 (holding that "the party
seeking to ascribe one corporation's action to another by disregarding their distinct
corporate entities must prove this allegation"). When, as here, there are multiple
defendants, we must test each defendant's actions and contacts with the forum separately. 
Morris v. Kohls-York, 164 S.W.3d 686, 693 (Tex. App.-Austin 2005, pet. dism'd). Joiner,
therefore, bore the burden of both pleading and proving jurisdiction as to Coast Paper and
Carol in this case.

 When a trial court does not issue findings of fact or conclusions of law with its
special appearance ruling, as in this case, all facts necessary to support the judgment and
supported by the evidence are implied. BMC Software, 83 S.W.3d at 795. When the
appellate record includes the reporter's and clerk's records, these implied findings are not
conclusive and may be challenged for legal and factual sufficiency in the appropriate
appellate court. Id.

 Moreover, in determining the special appearance, the trial court may refer to the
pleadings, any stipulations made by and between the parties, any affidavits and
attachments filed by the parties, discovery, and any oral testimony. Tex. R. Civ. P. 120a(3).III. Analysis

 In his sole issue on appeal, Joiner asserts that the trial court erred in granting the
special appearances because he submitted legally and factually sufficient evidence
establishing that Texas courts have general and specific jurisdiction over Carol and Coast
Paper. Specifically, Joiner contends that general and specific jurisdiction were established
by evidence showing that: (1) David and Carol acted as partners in a general partnership
conducting business in Texas; (2) the DRC Parties were organized by Carol as a sham to
perpetrate a fraud through intentional undercapitalization; (3) David was an agent for an
undisclosed principal, Coast Paper, which paid him a salary of $15,000.00 per month; (4)
the DRC Parties engaged in joint ventures with Coast Paper; (5) Carol sent Coast Paper
employees to Texas to work on tasks for the DRC Parties; (6) Carol and David allegedly
converted Joiner's property; and (7) no one has accounted for $2,163,490.09 that allegedly
went missing. 

 Conversely, Carol and Coast Paper argue that Joiner has failed to present any issue
for review. They further argue that Joiner failed to: (1) allege sufficient facts to invoke
jurisdiction under the Texas long-arm statute; and (2) discharge his burden in proving his
alter ego theory for purposes of establishing personal jurisdiction over both Coast Paper
and Carol.

A. Appellate Review

 At the outset of our analysis, we address the argument made by Coast Paper and
Carol that Joiner failed to present an issue for appellate review. We disagree.

 Joiner correctly notes that the trial court did not issue any findings of fact or
conclusions of law accompanying the order granting Coast Paper's and Carol's special
appearances. Moreover, Joiner specifically stated in his appellate brief that "[t]he trial court
erred in granting Defendant's Special Appearance objecting to the jurisdiction of the trial
court over the property and person of the Defendants, Coast Paper & Supply and Carol
Lynn Carava, pursuant to Rule 120a, Texas Rules of Civil Procedure" (emphasis in
original). Joiner proceeded to provide argument and authority to support its stated issue.

 Coast Paper and Carol rely on Martinez v. El Paso County, 218 S.W.3d 841, 844
(Tex. App.-El Paso 2007, pet. dism'd) in arguing that Joiner failed to present an issue for
this Court to review. The Martinez court noted that "[w]hen reviewing a civil matter, an
appellate court has no discretion to consider an issue not raised in the appellant's brief,
even if the ends of justice so require." Id. However, the Martinez court also noted that
"[a]n issue presented in an appellant's brief is sufficient if it directs the attention of the
appellate court to the error about which the complaint is made." Id. Because Joiner
specified that he took issue with the trial court's grant of the special appearances filed by
Coast Paper and Carol and because the record contains argument and authority
addressing this issue, we conclude that Joiner has presented this Court with issues
pertaining to general and specific jurisdiction for review. See id. ("Appellant's brief must
also contain a clear and concise argument containing appropriate citations to authority and
to the record. This requirement is not satisfied by merely uttering brief conclusory
statements, unsupported by legal citations.") (internal citations omitted). 

B. Due Process and Personal Jurisdiction

 A Texas court may exercise personal jurisdiction over a nonresident defendant only
if jurisdiction is authorized by the Texas long-arm statute, see Tex. Civ. Prac. & Rem. Code
Ann. § 17.042 (Vernon 1997), which permits Texas courts to exercise personal jurisdiction
over nonresident defendants who are doing business in Texas. (8)
 BMC Software, 83
S.W.3d at 795. Although the Texas long-arm statute lists activities that constitute "doing
business," this list is not exclusive, and "section 17.042's broad language extends Texas
courts' personal jurisdiction 'as far as the federal constitutional requirements of due
process will permit.'" BMC Software, 83 S.W.3d at 795 (quoting U-Anchor Adver., Inc. v.
Burt, 553 S.W.2d 760 , 762 (Tex. 1977)). Therefore, "the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due
process limitations." CSR Ltd. v. Link, 925 S.W.2d 591, 594 (Tex. 1996).

 Under the Due Process Clause of the Fourteenth Amendment of the United States 

Constitution, a Texas court may exercise personal jurisdiction over a nonresident
defendant when (1) the nonresident defendant has established minimum contacts with the
forum state, and (2) the exercise of jurisdiction comports with "traditional notions of fair play
and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); BMC
Software, 83 S.W.3d at 795; see U.S. Const. amend. XIV, § 1. "The exercise of personal
jurisdiction is proper when the contacts proximately result from actions of the nonresident
defendant which create a substantial connection with the forum state." Guardian Royal
Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991).

 A nonresident establishes minimum contacts with Texas by purposefully availing
itself of the privileges and benefits inherent in conducting business in the state. Moki Mac,
221 S.W.3d at 575 ("[A] defendant must seek some benefit, advantage or profit by
'availing' itself of the jurisdiction") (quoting Michiana Easy Livin' Country, Inc. v. Holten, 168
S.W.3d 777, 785 (Tex. 2005)); Michiana, 168 S.W.3d at 784 ("For half a century, the
touchstone of jurisdictional due process has been 'purposeful availment.'"); see Burger
King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985). 

 There are three parts to the purposeful availment inquiry. Michiana, 168 S.W.3d at
785. First, only the nonresident defendant's contacts with the forum are considered and
not the acts of a third person or another party. Id. (quoting Burger King Corp., 471 U.S.
at 475 ("This 'purposeful availment' requirement ensures that a defendant will not be haled
into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third
person.'")). Second, the contacts must be purposeful and not "random, isolated, or
fortuitous." Id. Finally, the nonresident defendant "must seek some benefit, advantage,
or profit by 'availing' itself of the jurisdiction." Id.

 To determine whether the exercise of personal jurisdiction over a nonresident
defendant comports with traditional notions of fair play and substantial justice, we consider,
when appropriate, the following: (1) the burden on the nonresident defendant; (2) the
forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining
convenient and effective relief; (4) the interstate judicial system's interest in obtaining the
most efficient resolution of controversies; and (5) the shared interest of the several states
in furthering substantive social policies. World-Wide Volkswagen Corp. v. Woodson, 444
U.S. 286, 292 (1980); Guardian Royal, 815 S.W.2d at 231.

C. General and Specific Jurisdiction

 A nonresident defendant's forum-state contacts may give rise to two types of
personal jurisdiction--general and specific jurisdiction. BMC Software, 83 S.W.3d at 795-96. If the defendant has made continuous and systematic contacts with the forum, general
jurisdiction is established whether or not the defendant's alleged liability arises from those
contacts. Id. at 796; CSR Ltd., 925 S.W.2d at 595. In contrast, when specific jurisdiction
is alleged, we focus the minimum-contacts analysis on the "relationship among the
defendant, the forum[,] and the litigation." Guardian Royal, 815 S.W.2d at 228 (citing
Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); Schlobohm
v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990)); see Moki Mac, 221 S.W.3d at 585 (holding
that there must be a substantial connection between the nonresident defendant's contacts
and the operative facts of the litigation). Specific jurisdiction is established if the
defendant's alleged liability "aris[es] out of or [is] related to" an activity conducted within the
forum. Helicopteros, 466 U.S. at 414, n.8; see also CSR Ltd., 925 S.W.2d at 595.

 Because the minimum contacts inquiry is broader and more demanding when
general jurisdiction is alleged, a showing of substantial activities in the forum state is
required. Schlobohm, 784 S.W.2d at 357. General jurisdiction is premised on the
nonresident having consented to jurisdiction through its continuous contact invoking the
benefits and protections of Texas. Am. Type Culture Collection v. Coleman, 83 S.W.3d
801, 807 (Tex. 2002). This analysis focuses on the nature and quality of the contacts, as
opposed to the quantity. Id. The contacts under general jurisdiction "should be such as
to justify categorizing the defendant as a resident of this State." Schexnayder v. Daniels,
187 S.W.3d 238, 243 (Tex. App.-Texarkana 2006, pet. dism'd w.o.j.).

D. Discussion

 Joiner admitted at oral argument that the crux of his argument in support of Texas
courts asserting personal jurisdiction over Coast Paper and Carol is premised primarily on
an alter ego theory based on David's actions as director and officer of DRC Management
Company and DRC Distributors. (9) 

 1. Alter Ego Theory

 An individual's contacts with Texas on behalf of a business entity that is designed
to limit individual liability do not ordinarily establish personal jurisdiction over the individual,
but an exception is recognized for cases in which the trial court finds alter ego is
implicated. Solow v. Century Assets Corp., 12 S.W.3d 512, 516 (Tex. App.-Beaumont
1999, no pet.); J & J Marine, Inc. v. Ha Van Le, 982 S.W.2d 918, 927 (Tex. App.-Corpus
Christi 1998, no pet.). Under the theory of alter ego, courts may disregard the formal
registration of a company because there exists such unity between the company and the
individual that the company ceases to be a separate entity. In re Smith, 192 S.W.3d 564,
568 (Tex. 2006).

 Alter ego is a theory under which plaintiffs may pierce the corporate veil and hold
individual officers, directors, and stockholders of a company personally liable. (10) J & J
Marine, 982 S.W.2d at 927. It is important to note, though, that the instant case presents
the issue of jurisdictional veil-piercing, which involves different elements of proof than
substantive veil-piercing for the purpose of liability. See PHC-Minden, L.P. v. Kimberly-Clark Corp., 235 S.W.3d 163, 174 (Tex. 2007). We do not assess certain issues, such as
fraud and undercapitalization, which go to the issue of substantive veil-piercing. See id.
(citing Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 425 (9th Cir. 1977));
see also Gonzalez v. Lehtinen, No. 13-06-441-CV, 2008 Tex. App. LEXIS 1889, at *13
(Tex. App.-Corpus Christi Mar. 13, 2008, no pet. h.) (mem. op.). Instead, we focus our
analysis upon whether Joiner demonstrated that Carol controlled the internal business
operations of the DRC Parties to a degree "greater than that normally associated with
common ownership and directorship." BMC Software, 83 S.W.3d at 799.

 An alter-ego analysis cannot be reduced to an authoritative or exclusive list of
discrete "elements" which may be tested. Leon, Ltd. v. Albuquerque Commons P'ship, 862
S.W.2d 693, 707 (Tex. App.-El Paso 1993, no pet.); see also Eckardt v. Hardeman, No.
03-98-00274-CV, 1999 Tex. App. LEXIS 450, at *8 (Tex. App.-Austin 1999, pet. denied)
(mem. op.) (providing some guidelines for considering whether an entity is merely the alter
ego of an individual, such as the "total dealings of the corporation and the individual,
including the degree to which corporate formalities have been followed and corporate and
individual property have been kept separately, the amount of financial interest, ownership
and control the individual maintains over the corporation, and whether the corporation has
been used for personal purposes").

 The burden to prove alter ego rests upon the party who is arguing that the two
parties are actually one entity. BMC Software, 83 S.W.3d at 798; see also J & J Marine,
982 S.W.2d at 927 (stating that the two entities must be so related that the corporate entity
is merely a "sham"). If we find alter ego, then the company's amenability to suit in Texas
is imputed to the individual. See Moki Mac, 221 S.W.3d at 574; see also Gonzalez, 2008
Tex. App. LEXIS 1889, at *19.

 In making his alter ego contention, Joiner relies heavily on his contention that Carol
organized the DRC Parties as a sham to perpetrate a fraud on creditors through intentional
undercapitalization. However, intentional undercapitalization of the business entity is
relevant to an argument of substantive veil-piercing, not jurisdictional veil-piercing. See
PHC-Minden, L.P., 235 S.W.3d at 174. Joiner further contends that because DRC
Management Company's charter was forfeited on March 22, 2002, due to its failure to
timely pay taxes to the State of Texas, and because Carol was an officer of the entity, she
organized DRC Management Company with the intent to perpetrate a fraud. However, this
contention, once again, goes to substantive veil-piercing, not jurisdictional veil-piercing. 
See id. It is also noteworthy that Carol stated in her affidavit that she did not control the
day-to-day operations of the DRC Parties. This statement undermines Joiner's implication
that Carol controlled the internal business operations of DRC to a degree "greater than that
normally associated with common ownership and directorship." See BMC Software, 83
S.W.3d at 799. We find that Joiner failed to meet his burden of proving his alter ego
contention. Therefore, the alter ego theory cannot serve as a basis for personal jurisdiction
over Carol. See id.; see also Moki Mac, 221 S.W.3d at 574 (noting that if a reviewing court
finds alter ego, then the company's amenability to suit in Texas is imputed to the
individual); Eckardt, 1999 Tex. App. LEXIS 450, at *8. 

 2. Personal Jurisdiction Over Carol Carava

 Joiner also contends that Texas courts have personal jurisdiction over Carol based
on her actions as the chief executive officer of Coast Paper and the secretary and
treasurer of DRC Management Company. Much of Joiner's argument pertaining to Carol
addresses her potential liability as a corporate officer. Joiner contends that: (1) David and
Carol, acting as partners of DRC Distributors, conducted business in Texas; (2) Carol
organized the DRC Parties as a sham to perpetrate a fraud on the DRC Parties' creditors
through intentional undercapitalization; (3) Carol and David converted his property; and (4)
Carol regularly sent employees from California to Texas to work on tasks for the DRC
Parties. Based on these allegations, Joiner argues that Carol purposefully availed herself
to the jurisdiction of Texas courts. (11)
 We disagree.

 The record does not reflect that Carol purposefully availed herself to the jurisdiction
of Texas courts. In fact, Carol executed an affidavit on November 22, 2006, see Tex. R.
Civ. P. 120a(3), appearing to negate all the jurisdictional bases alleged by Joiner. Her
affidavit provided the following, in relevant part: 

 She is a resident of California and she has never been a resident of Texas.


 


 She has never done business in the State of Texas in her individual capacity.


 


 She was a shareholder in DRC Management Company and served as the
secretary and treasurer of DRC Management Company. 

 DRC Management Company and DRC Distributors were organized for a
legitimate business purpose--supplying paper products and other items to
retail establishments in South Texas--but ceased doing business at or about
the time giving rise to Joiner's claims because the entities were wound up.

 She has traveled to Texas approximately five to six times, all of which were
in her capacity as an officer of DRC Management Company. On some
occasions, she brought David's daughter to visit him in Harlingen, Texas.


 


 In her capacity as secretary and treasurer of DRC Management Company,
she assisted with payroll and, on one occasion, prepared W-2s. She did not
help with day-to-day operations. 

 She knew of the initial purchase of personal and real property from Joiner by
DRC Distributors, but she never signed any of the relevant documents
conveying the property, and to the extent that she participated in the
negotiations, she did so in her representative capacity for DRC Management
Company.


 


 She has never solicited business in Texas.


 


 She has never employed residents of the State of Texas as employees,
agents, or representatives in her individual capacity other than to represent
her in this lawsuit.

 She has not committed a tort, in whole or in part, in Texas in any capacity.




 She has never consented to the jurisdiction of Texas courts in her individual
capacity.


 

Moreover, Carol noted that exercising jurisdiction over her person and property in this case
would offend traditional notions of fair play and substantial justice because the proper
jurisdiction for this proceeding is in California, and because litigation in Texas would be
extremely expensive for her and would cause "substantial disruption to [her] professional
and personal life in the event of a prolonged absence for litigation purposes."

 In conjunction with his filing opposing Carol's special appearance, Joiner himself
executed an affidavit echoing the contentions he has made on appeal. However, the
record does not contain competent evidence either proving his conclusory allegations or
refuting Carol's affidavit. 

 In determining whether Carol purposefully availed herself to the jurisdiction of Texas
courts, we must focus on only her contacts with the forum, whether her contacts with Texas
were purposeful and not "random, isolated, or fortuitous," and whether she sought "some
benefit, advantage, or profit by 'availing' [herself] of [Texas] jurisdiction." See Michiana,
168 S.W.3d at 785. Joiner has not established any of these elements. Joiner relies
heavily on David's actions as the chief executive officer of the DRC Parties in imputing
jurisdiction to Carol. It is undisputed that David is a Texas resident, but we must focus on
the contacts of the nonresident, Carol, as opposed to David's contacts with Texas. Id.
Carol admitted to visiting Texas five or six times in her capacity as secretary and treasurer
of DRC Management Company. See Morris, 164 S.W.3d at 696 ("The fiduciary shield
doctrine protects a corporate officer or employee from the trial court's exercise of general
jurisdiction when all of the individual's contacts with Texas were on behalf of the
employer."). Carol noted in her affidavit that on some of her trips to Texas, she brought
David's daughter along for a family visit. See Am. Type Culture Collection, 83 S.W.3d at
807 (noting that we should focus on the nature and quality of the contacts, not the
quantity). Because all of Carol's trips to Texas were in her capacity as an officer of DRC
Management Company, and because many of her trips were family related, we cannot say
that Carol's contacts with Texas were continuous and systematic in accordance with
general jurisdiction principles. See BMC Software, 83 S.W.3d at 796; CSR Ltd., 925
S.W.2d at 595. Furthermore, Joiner has not established that Carol sought some benefit,
advantage, or profit from Texas in her individual capacity. 

 With respect to specific jurisdiction, we focus the minimum-contacts analysis on the
"relationship among the defendant, the forum[,] and the litigation." See Moki Mac, 221
S.W.3d at 585. Carol admitted in her affidavit that as secretary and treasurer of DRC
Management Company and DRC Distributors, she was aware of the asset purchase sale
and the subsequent general warranty deed. See Virtual Healthcare Servs., Ltd. v.
Laborde, 193 S.W.3d 636, 644 (Tex. App.-Eastland 2006, no pet.) (providing that "notice
that [directors and officers of corporations] may be liable for corporate debts does not
justify a conclusion that nonresident officers and directors could reasonably anticipate
being called into a Texas court"). However, she denied signing the relevant paperwork
conveying the real and personal property. Because Carol did not sign any of the
documents at issue in the underlying dispute, and because the record does not suggest
that Carol purposefully availed herself of the jurisdiction of Texas courts, we conclude that
Joiner also has not established that Texas has specific personal jurisdiction over Carol. 
See Morris, 164 S.W.3d at 694 (concluding that a nonresident should be "haled" into a
Texas court only as a result of intentional activities).

 Based on the foregoing, we conclude that Joiner failed to meet his burden in
establishing that Carol had minimum contacts with Texas; therefore, the trial court's
judgment granting Carol's special appearance is supported by legally and factually
sufficient evidence. 

 3. Personal Jurisdiction Over Coast Paper

 As previously mentioned, Joiner primarily premises his jurisdictional arguments
pertaining to Coast Paper on an alter ego theory. Specifically, Joiner asserts that Texas
courts have general and specific jurisdiction over Coast Paper because: (1) David was an
agent for an undisclosed principal, Coast Paper, which paid him $15,000.00 per month; (2)
DRC Management Company and Coast Paper engaged in joint ventures pertaining to
product sales; and (3) Coast Paper employees were sent from California to Texas to work
on tasks for the DRC Parties. 

 On November 22, 2006, Carol, acting in her capacity as president of Coast Paper,
filed an affidavit on behalf of Coast Paper. In this affidavit, Carol stated, among other
things, the following:


 Coast Paper has never done business in Texas.


 


 Coast Paper has never obtained a certificate of authority to do business in
Texas.


 


 Coast Paper has never consented to the jurisdiction of Texas courts.


 


 Coast Paper has never employed residents of Texas as employees, agents,
or representatives for Coast Paper to do business or represent it in Texas. 
David performed consulting work for Coast Paper in California while he lived
in Texas, but such work was done when David traveled to California.


 

 

 David was not an agent for Coast Paper, and his services as an officer of
Coast Paper were performed in California.

 The DRC Parties and Coast Paper were, at all material times, separate and
distinct entities; Coast Paper never commingled assets with the DRC Parties;
and Coast Paper is not affiliated with the DRC Parties in any way.


 


 Coast Paper never paid salaries to employees of the DRC Parties for work
done for the DRC Parties.


 


 Coast Paper was not a party to the underlying agreement of which Joiner
complains.


 


 Coast Paper has never owned or leased property in Texas.


 


 Coast Paper has never been a party to litigation transpiring in Texas, prior
to this lawsuit.


 


 Coast Paper has not committed any tort, in whole or in part, in Texas.


 


 Coast Paper does not have any continuing or systematic contacts with
Texas, and Coast Paper has not purposefully availed itself of the benefits of
Texas law.


 


 Joiner's claims do not pertain to any activity conducted by Coast Paper in
Texas.


 

Moreover, Carol noted that exercising jurisdiction over Coast Paper in this case would
offend traditional notions of fair play and substantial justice because jurisdiction is proper
in California and the expense of litigating this lawsuit in Texas would "cause substantial
disruption to Coast Paper's daily business functions in its place of business--California."

 In his filing opposing Coast Paper's special appearance, Joiner attached an affidavit
that was identical to the one used to attack Carol's special appearance. Again, this
affidavit echoed the issues Joiner has alleged on appeal. 

 At the hearing on the special appearances, the following exchange, which is central
to our analysis pertaining to Coast Paper, occurred: 

 [Joiner's counsel]: Mr. Carava testified in his deposition that he was a full-

 time employee of Coast Paper and Supply. He was
being paid $15,000 per month for his services by Coast
Paper and Supply. He drew no money from DRC
Distributors or the corporation. His sole income was
from Coast Paper and Supply.

 He testified that he split time between California
and between Texas. He kept a residence in Texas. He
traveled back and forth. When he was in Texas, he
would conduct California business. When he was in
California, he would conduct Texas business.


 THE COURT: I guess the question is, though, what business did he
conduct on behalf of Coastal [sic] in the State of Texas? 
That's the question.

 

 [Joiner's Counsel]: Well--

 

 THE COURT: He may have been employed by them, but what
responsibilities or business did he conduct on their
behalf in the State of Texas?

 

 [Joiner's counsel]: One of the functions he handled on behalf of both
organizations [Coast Paper and the DRC Parties] was
the coordination of mutual purchases of products.[ (12)]

 

 THE COURT: Well, but my inquiry is specific. You know, at this point
I'm trying to segregate them both because there is [sic]
two different entities. So he may have had dual
responsibilities at the time. You know, for that matter,
he could have been an officer or of some other
company in some other state. But the question is, from
the Court's inquiry here is, what acts, if any, did he
conduct in the State of Texas for the benefit of Coastal
[sic], the defendant, if you know?

 

 [Joiner's counsel]: Well, it would be our argument that the running of DRC
was effectively an act for Coastal [sic]. He, in
addition--well, he and his mother in addition to being
officers of DRC were also officers and stockholders.[ (13)]

 

 THE COURT: I understand that.

 

 [Joiner's counsel]: Was basically a family business.

 

 THE COURT: I understand that, but I guess, you know, without getting
into what Coastal's [sic] nature of business was, let's
assume they sold forklifts, you know, and did he make
sales calls or sell forklifts? Did he sell forklifts in
Texas? You know, that kind of thing. And I don't know,
maybe you don't know the answer to the question, but
that's kind of my inquiry right now as to that defendant,
other than the fact that he was on their payroll.

 

 [Joiner's counsel]: The only way I can answer it is in his deposition he
states that he did consulting work to Coastal [sic].

 

 THE COURT: Well, I understand that.

 

 [Joiner's counsel]: It was not pursued as to what, so I don't--I don't want
to go outside of what he's got in his deposition because
that's the only thing I have in the record that I can
present to this Court as evidence.

 

 Coast Paper's counsel countered by arguing that:


 Coast Paper does not have, didn't have anything to do with the agreements
that were reached that reconveyed this property back which is the basis of
the lawsuit. So under specific jurisdiction--that's being asserted in this case
by the plaintiff against or to try to get Coast Paper in this case is not based
out of the contracts that they're claiming was [sic] induced by fraud or that
was [sic] breached on a lien that was on this property when the property was
reconveyed back to the plaintiff.

 

 . . . .


 With regard to the minimum contacts, under general jurisdiction, the only
allegations that have been made or at least the ones that seem to have
Coast Paper in Texas is that David Carava was a consultant for Coast Paper
and Supply, and he did that while he was down in Texas. Well, the fact of
the matter is, is that David Carava did do Coast Paper consulting work, but
what he did was he used to go to California to find out what--basically,
perform most of everything that he did when he was in California. 


 The record contains a transcript of David's deposition where he stated that he
"would go out with some of the salesguys and [he] would counsel her [Carol] and advise
her on the phone about different things. I was doing kind of all different kinds of jobs in
California and when I was in Texas." David also testified that he was paid $15,000 per
month by Coast Paper to do Coast Paper work, or whatever Carol believed to be Coast
Paper work, and that the DRC Parties did not pay him. At the deposition, David admitted
that he sometimes did California work--i.e. Coast Paper work--while he was in Texas. 

 Despite David's deposition testimony and Joiner's arguments made at the special
appearance hearing, Coast Paper has negated all bases for jurisdiction raised by Joiner. 
Joiner bases Coast Paper's contacts with Texas on David's consulting work done in Texas
and on alleged joint ventures between Coast Paper and the DRC Parties. The record does
not support Joiner's contention that Coast Paper and the DRC Parties entered into any
joint ventures. Furthermore, Joiner has not established how much work David did for
Coast Paper while residing in Texas. Assuming arguendo that David was an employee of
Coast Paper, the fact that Joiner failed to demonstrate what and how much work was done
in Texas on Coast Paper's behalf undermines any finding that Coast Paper had continuous
or systematic contacts with Texas. See BMC Software, 83 S.W.3d at 796; CSR Ltd., 925
S.W.2d at 595. With respect to the second prong of the general jurisdiction inquiry, Joiner
alleges that Coast Paper's contacts with Texas are derived from David's consulting work
done in Texas. Again, considering that Joiner was unable to adequately specify what and
how much work was done in Texas on behalf of Coast Paper by David, his contacts with
Texas on behalf of Coast Paper cannot be considered to be purposeful. See Michiana,
168 S.W.3d at 785. David's contacts with Texas on behalf of Coast Paper are random or
isolated at best. See id. Finally, the evidence does not demonstrate that Coast Paper
availed itself of Texas's jurisdiction for the purpose of deriving a benefit, advantage, or
profit. See id. 

 With respect to specific jurisdiction, the record reflects that Coast Paper: (1) was
not involved in the underlying asset sale; (2) has neither conducted business nor registered
in Texas; (3) has not commingled assets with the DRC Parties; and (4) has not paid
salaries to any employees doing work for the DRC Parties. Therefore, Joiner has not
adequately established a "relationship between the defendant [Coast Paper], the forum[,]
and the litigation." See Moki Mac, 221 S.W.3d at 585.

 To the extent that Joiner asserts an alter ego theory to establish jurisdiction over
Coast Paper, the record does not reflect that Carol, on behalf of Coast Paper, sent Coast
Paper employees to Texas to work on tasks for the DRC Parties. The evidence does not
indicate that the DRC Parties were formed to "conceal the involvement" of Coast Paper. 


Moreover, the record does not reflect that David was an agent for or represented Coast
Paper in Texas. As a result, Joiner has failed to meet his burden of proving his alter ego
theory that Coast Paper availed itself to the jurisdiction of Texas courts. 

 Based on the foregoing, we conclude that Joiner has failed to establish that Coast
Paper had minimum contacts with Texas; therefore, the trial court's judgment granting
Coast Paper's special appearance is supported by legally and factually sufficient evidence. 
Joiner's sole issue is overruled.

IV. Conclusion

 We affirm the judgment of the trial court.

 

 ______________________________

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 29th day of July, 2008. 

 


1. In its filings with the state of California, Coast Paper named Carol Carava as its chief executive
officer and chief financial officer. In addition, David Carava was named as the secretary of the corporation.
2. Joiner Food Service, Inc. is a Texas corporation owned and operated by appellant.
3. DRC Distributors, Ltd. and DRC Management Company, Inc. are both Texas registered entities. 
In its filings with the Texas Secretary of State's Office, DRC Distributors noted that the name of its registered
agent is David R. Carava and the address of the registered office of the partnership was 821 West Jackson
Street, Harlingen, Texas 78550. In addition, DRC Management Company was named the general partner
of DRC Distributors. In its filings, DRC Management Company used the same address for DRC Distributors's
principal office. Moreover, DRC Management Company, in its 2002 Texas franchise tax public information
report, named Carol Carava as the secretary and treasurer of the entity and David Carava as the owner and
president. Subsequently, in its 2003 and 2006 Texas franchise tax public information reports, DRC
Management Company provided the following address for its principal office: "11 Lawridge, Santa Cruz, CA
95060."


 As the general partner of DRC Distributors, DRC Management Company owned a one percent
interest in DRC Distributors for which it paid $10,000. David Carava, as a Class A limited partner, owned a
ninety-eight percent interest in DRC Distributors for which he paid $980.00. Carol Carava, as a Class B
limited partner, retained a one percent interest in DRC Distributors for which she paid $1,000,000.
4. DRC Distributors filed a certificate of cancellation with the Texas Secretary of State's Office on July
14, 2003, stating that the Certificate of Limited Partnership was being cancelled due to the completion of the
winding up of the limited partnership.
5. On March 22, 2002, the State of Texas revoked DRC Management Company's charter to do
business in Texas for non-payment of taxes. See Tex. Tax Code Ann. § 171.301 (Vernon 2008). DRC
Management Company's charter to do business in the State of Texas was subsequently reinstated on August
17, 2006.
6. On November 8, 2007, the trial court, in response to a counter-petition filed by the DRC Parties and
David, granted the DRC Parties and David declaratory relief pursuant to section 37.011 of the civil practice
and remedies code. See Tex. Civ. Prac. & Rem. Code Ann. § 37.011 (Vernon 1997). The trial court also
dismissed with prejudice all of Joiner's claims against the DRC Parties and David in the second lawsuit.
7. Generally, in an accelerated appeal, a party's notice of appeal must be filed within twenty days after
the judgment or order is signed. Tex. R. App. P. 26.1(b). However, the record reflects that this Court granted
Joiner's motion to extend the deadline for filing his notice of appeal and that Joiner timely filed his notice of
appeal within the amended appellate deadline. See Tex. R. App. P. 26.3. 
8. Section 17.042 of the civil practice and remedies code provides a non-exclusive list of acts that
constitute doing business in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). Specifically,
"a nonresident does business in this state if the nonresident: (1) contracts by mail or otherwise with a Texas
resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole
or in part in this state; or (3) recruits Texas residents, directly or through an intermediary located in this state,
for employment inside or outside this state." Id. 

9. At the special appearance hearing, Joiner characterized his arguments as such:


 It's been alleged that David Carava and Carolyn Carava are personally liable for the debts
of DRC. It's been alleged that DRC Distributors is the alter-ego of DRC Management. It's
been alleged that DRC Management was organized as a sham to perpetrate a fraud. It's
been alleged that DRC Management is the alter-ego of David Carava.


At no point did Joiner contend that either of the DRC entities were the alter-ego of Carol or Coast Paper. In
addition, Joiner admitted that neither Coast Paper nor Carol were necessary parties to the underlying litigation. 
10. The alter ego doctrine is not applicable "with regard to a limited liability partnership because there
is no veil that needs piercing." Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Ass'n, 77 S.W.3d
487, 500 (Tex. App.-Texarkana 2002, no pet.). Because DRC Distributors is a limited partnership, we will
focus on the relationship between DRC Management Company, David, Carol, and Coast Paper with respect
to Joiner's alter ego theory.
11. At the hearing on the special appearances, Joiner stated that "[a]s far as the liability that she [Carol]
assumed, the jurisdiction the State has over her [is] because of the revocation of the corporate charter."

12. We note that the Texas and United States Supreme Courts have held that "mere purchases, even
if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over
a nonresident corporation in a cause of action not related to those purchase transactions." BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 798 (Tex. 2002) (quoting Helicopteros Nacionales de Colombia,
S.A. v. Hall, 466 U.S. 408, 418 (1984)).
13. The Texas Supreme Court has also held that "[a] subsidiary corporation will not be regarded as the
alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or
officers, or an exercise of the control that stock ownership gives to stockholders." Id. (quoting Gentry v. Credit
Plan Corp. of Houston, 528 S.W.2d 571, 573 (Tex. 1975)).